[No. 37770-5-II.   Division Two.   August 11, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSHUA LEE HAYWARD, *Appellant*.

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), for appellant.

*Deborah S. Kelly, Prosecuting Attorney*, and *Brian P. Wendt, Deputy*, for respondent.

¶1 VAN DEREN, C.J. — Joshua Hayward appeals his conviction for second degree assault. He argues that the jury instruction defining "recklessness" created a mandatory presumption and relieved the State of its burden to prove recklessness. He further argues that a State's witness improperly testified on a legal element in violation of Hayward's constitutional right to a jury trial. We agree that the jury instruction defining "recklessness" deprived Hayward of his due process rights because it relieved the State of its burden to prove all elements of the crime; thus, we reverse his conviction and remand for further proceedings.

## BACKGROUND

### I. FACTS

¶2 On the night of March 24, 2007, Joshua Hayward attended a party at Brandon Vaughan's residence in Port Angeles. During the party, Hayward and Tyson Baar had a verbal argument and Hayward hit Baar in the face or neck. Baar sustained a broken jaw and underwent surgery that resulted in his jaw being temporarily wired shut. The State charged Hayward with second degree assault as a result of this altercation.

¶3 At trial, Ryan Muck testified that he attended the party at Vaughan's residence on the night of March 24.

Approximately 35 people attended the party, with "about ten [or] fifteen people outside and twenty inside." Report of Proceedings (RP) (Apr. 7, 2008) at 34. During the party, an argument occurred between Baar and Shawn Mellott outside the residence. Baar was intoxicated; Muck testified, "I'd never seen [Baar] that drunk and I've known him for quite a while." RP (Apr. 7, 2008) at 35.

¶4 During the argument, Baar threatened to beat up Mellott. "Quite a few people tr[ied] to break [up the fight], [Muck], Rachael Potter, Jessica Harris . . . . I guess [Hayward] was part of it." RP (Apr. 7, 2008) at 37. Muck then saw Hayward walk up and punch Baar in the face. Muck testified that Hayward hit Baar with his left hand and that he struck him underneath the jaw, using an "uppercut" punch. RP (Apr. 7, 2008) at 53. "It was a good hit." RP (Apr. 7, 2008) at 51. Muck did not witness Baar pushing or striking Hayward before Hayward hit Baar. After the punch, Baar "kept saying 'I just want to talk to you Josh[.] I just want to talk to you.' " RP (Apr. 7, 2008) at 41.

¶5 Rachael Potter testified that "there w[ere] a lot of people in a circle standing around . . . [a]nd, Mr. Hayward . . . was . . . standing in front of [Baar] and they were yelling back and forth." RP (Apr. 8, 2008) at 51. Potter testified that she jumped in between Baar and Hayward as they were arguing. Baar moved Potter out of the way and was looking down at Potter when Hayward hit him. Hayward hit Baar on the left side of the face with his right hand. She testified that there was blood coming out of Baar's mouth immediately following the punch.

¶6 Baar testified that he drank "six to twelve beers" on the night of March 24. RP (Apr. 7, 2008) at 58. He and Mellott argued over money that Mellott owed him and during the argument Mellott's girl friend, Jessica Harris, pushed him. Baar was still talking to Mellott when Hayward punched him on the left side of his jaw. Baar testified that he did not see the punch coming but that Hayward struck him on the left side of the jaw. Baar did not

remember any words exchanged with Hayward before the blow. Following the blow, Baar's mouth bled and "[his] jaw didn't open and shut and it hurt." RP (Apr. 7, 2008) at 63. Baar recalled trying to contact Hayward inside the house after the altercation to ask him why he hit him.

¶7 Hayward testified that he arrived at the party with his girl friend, Kashia Thurman, around 10:30 PM on March 24, 2007. As Hayward drove up to the party, he saw Harris and Baar arguing. Hayward rolled down his window and asked Harris what was going on. Harris replied that "[Baar] wouldn't leave." RP (Apr. 8, 2008) at 74. Hayward testified that Baar walked to Hayward's car and slapped him in the face. Thurman testified that Baar slapped Hayward while she and Hayward were still in the vehicle.[1] Hayward parked his car and went inside.

¶8 Approximately 45 minutes later, Hayward overheard someone say that Baar had pushed Harris to the ground outside. As Hayward walked toward the door to investigate, Vaughan told Hayward "to tell whoever was outside that was starting the fights to leave."[2] RP (Apr. 8, 2008) at 79. Hayward went outside and saw Mellott and Baar arguing about a truck and Hayward told Baar to leave. Baar refused and Hayward told him again that he needed to leave. Baar refused again and laughed. Hayward told Baar a third time that he needed to leave; then someone from the crowd pushed Hayward into Baar and Baar pushed Hayward back. Hayward looked back to see who had pushed him and, as he turned back around to face Baar, he saw Baar's left hand swinging toward him. Hayward testified that Baar hit him near his right ear. Hayward then hit Baar with his left hand in a partially closed fist.[3] He testified that he struck Baar by his ear and that "the force [he] used could not have broke[n] [Baar's] jaw." RP (Apr. 8, 2008) at 108.

---

[1] Thurman also testified that she encountered Baar following the fight between Hayward and Baar and that he "was speaking just fine." RP (Apr. 8, 2008) at 164.

[2] Vaughan corroborated this testimony.

[3] Hayward is right-handed.

¶9 Mellott testified that Harris and Hayward are good friends. Harris began arguing with Baar after Mellott's confrontation with Baar. Hayward and Baar were first talking to each other, then began yelling, and finally were pushing each other. Hayward hit Baar with his left hand. Mellott testified that Hayward did not seem to hit Baar with his full strength and that Baar did not fall back. He testified that Baar "just kind of stood there and just kept talking to [Hayward]" following the punch. RP (Apr. 7, 2008) at 125.

¶10 Muck took Baar home approximately 10 minutes after the incident and Baar went immediately to bed. "[W]hen I woke up it hurt really bad and so I went to the hospital." RP (Apr. 7, 2008) at 64. Baar's mother, Shara Smith, testified that Baar's girl friend called her the morning of March 25 "and said Tyson had been hurt and asked me to come over to their apartment." RP (Apr. 7, 2008) at 90. Baar could hardly talk and his mouth was swollen. They took Baar to Olympic Medical Center. While Smith waited in the emergency room, Hayward arrived and talked with her. "[Hayward] told [Smith] that [Baar] was arguing with one of his friends called Shawn Mellott and that he got in the middle between them and that he had hit [Baar] and he didn't mean to hurt him and he felt bad." RP (Apr. 7, 2008) at 93-94.

¶11 Doctor James Wallace, an emergency physician at Olympic Medical Center, testified that he treated Baar on March 25. Baar had a fracture to his left mandible and a possible fracture to his right mandible. Baar required "surgical stabilization" of his jaw, so Wallace referred him to Harborview Medical Center. RP (Apr. 8, 2008) at 34. Two days later, Baar went to Harborview Medical Center for surgery on his jaw. Medical personnel placed three metal plates in his mouth and wired his jaw shut. Baar spent two days in the hospital and his jaw remained wired shut for approximately two months.

¶12 During Wallace's testimony, the prosecutor asked Wallace the following question: "In your opinion, is the

injury that Mr. Baar sustained, is that one that would be a temporary but substantial loss or impairment o[f] the function of a body part?" RP (Apr. 8, 2008) at 38-39. Hayward objected to the question. The trial court excused the jury from the courtroom and the prosecutor argued that the question was proper under ER 704. Hayward argued that the "question asked . . . deals clearly with the legal standard." The court overruled the objection, stating, "I think it's admissible under 704. . . . I don't think the . . . doctor is giving an opinion as to guilt[ ]. He's giving a medical opinion." RP (Apr. 8, 2008) at 40.

¶13 In the presence of the jury, the prosecutor repeated the question and Wallace responded, "Yes." He explained that "there is considerable pain involved in this. But the main issue is that [the] mandible can't be used for this period of time, during the healing, which greatly limits one's ability to communicate. [S]o this is a substantial loss of function of that body part, definitely." RP (Apr. 8, 2008) at 41.

II. Jury Instructions

¶14 When the trial court addressed the jury instructions, it stated that the prosecutor had "left [out] that one sentence that says 'the defendant has no burden of proving a reasonable doubt exists,' so I changed that." RP (Apr. 8, 2008) at 184. The trial court then suggested a lesser included offense instruction for fourth degree assault. The State argued that there was insufficient evidence of fourth degree assault but the trial court included the instruction, stating that it was consistent with Hayward's self-defense argument. No other discussion of the jury instructions appears in the record.

¶15 The trial court's instructions to the jury included the "to convict" instruction, jury instruction 7, for second degree assault:

> To convict the Defendant of the crime of assault in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 25th day of March, 2007, the Defendant intentionally assaulted Tyson Baar;

(2) That the Defendant thereby recklessly inflicted substantial bodily harm on Tyson Baar; and

(3) That the acts occurred in the State of Washington.

Clerk's Papers (CP) at 30 (emphasis omitted).

¶16 Jury instruction 6 stated, "A person commits the crime of assault in the second degree when he or she intentionally assaults another and thereby recklessly inflicts substantial bodily harm." CP at 29 (emphasis omitted).

¶17 Jury instruction 8 defined "substantial bodily harm" as "bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part." CP at 31.

¶18 Jury instruction 9 defined "intent": "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result which constitutes a crime, whether or not the person is aware that the result is a crime." CP at 32.

¶19 Jury instruction 10 defined "recklessness":

A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and the disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.

Recklessness also is established if a person acts intentionally.

CP at 33. Neither party objected to the jury instructions.

¶20 The jury found Hayward guilty of second degree assault. He was sentenced to eight months' incarceration. Hayward appeals.

## ANALYSIS

### I. RECKLESSNESS JURY INSTRUCTION

¶21 Hayward argues that the trial court's instruction defining recklessness "created a mandatory presumption and relieved the State of its burden to prove that Mr. Hayward recklessly inflicted substantial bodily harm." Br. of Appellant at 6 (emphasis omitted). He argues that second degree assault requires two separate mental states, "intentional assault" and "reckless infliction of substantial bodily harm." Br. of Appellant at 8. Because the jury was instructed that recklessness is established " 'if a person acts intentionally,' " jury instruction 10 created a conclusive presumption in conflict with the presumption of innocence. Br. of Appellant at 8 (quoting CP at 33).

¶22 The State argues that "[t]he jury was instructed on both mental elements in two separate instructions." Br. of Resp't at 5. Further, the State argues, the "to convict" instruction "clearly set out" the elements of second degree assault. "There is no reason to think that the jury was confused by the instructions or conflated the two mental states. It is well established law that juries are presumed to follow the instructions provided." Br. of Resp't at 5. Finally, the State argues that, assuming jury instruction 10 was erroneous, it was harmless error because "[t]he evidence was overwhelming that the defendant intentionally assaulted Mr. Barr [sic] and that in doing so he recklessly inflicted substantial bodily harm." Br. of Resp't at 6.

### A. Standard of Review

¶23 We review alleged errors of law in jury instructions de novo. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). "Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law." *Barnes*, 153 Wn.2d at 382. "It is reversible error to instruct the jury in a manner that would relieve the

State of [its] burden" to prove "every essential element of a criminal offense beyond a reasonable doubt." *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). We analyze a challenged jury instruction by considering the instructions as a whole and reading the challenged portions in context. *Pirtle*, 127 Wn.2d at 656-57.

B. Mandatory Presumption

¶24 A mandatory presumption is one that requires the jury "to find a presumed fact from a proven fact." *State v. Deal*, 128 Wn.2d 693, 699, 911 P.2d 996 (1996). To determine whether a jury instruction creates a mandatory presumption, we examine whether a reasonable juror would interpret the presumption as mandatory. *Deal*, 128 Wn.2d at 701. Mandatory presumptions violate a defendant's right to due process if they relieve the State of its obligation to prove all of the elements of the crime charged. *State v. Thomas*, 150 Wn.2d 821, 844, 83 P.3d 970 (2004).

¶25 In *State v. Goble*, 131 Wn. App. 194, 126 P.3d 821 (2005), we held that the jury instruction defining "knowledge" created a mandatory presumption. In *Goble*, two police officers encountered Goble and his grandson in a bar parking lot. 131 Wn. App. at 196. The officers testified at trial that the grandson "ran 'aggressively' toward [them], screaming obscenities and threats." *Goble*, 131 Wn. App. at 197 (quoting *Goble* Report of Proceedings at 33). As the officers began handcuffing the grandson, Goble grabbed one of the officers by the neck. *Goble*, 131 Wn. App. at 197. Goble was charged with third degree assault. *Goble*, 131 Wn. App. at 196. Goble testified at trial that he thought the officer was a member of a nearby crowd and he grabbed the man in an attempt to protect his grandson. *Goble*, 131 Wn. App. at 199.

¶26 The jury instructions included a definition of "knowledge" that included a statement that " '[a]cting knowingly or with knowledge also is established if a person acts intentionally.' " *Goble*, 131 Wn. App. at 202 (emphasis omitted) (quoting *Goble* Clerk's Papers at 44). This instruc-

tion was based on former *Washington Pattern Jury Instruction* 10.02. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.02, at 150 (2d ed. 1994) (WPIC); *Goble*, 131 Wn. App. at 202. During deliberations, the jury asked for clarification of the knowledge instruction. The jury found Goble guilty of third degree assault. *Goble*, 131 Wn. App. at 200.

¶27 Goble appealed his conviction, arguing that the knowledge instruction relieved the State of its burden to prove that Goble knew the victim was a police officer and that the instruction "did not follow the exact wording of RCW 9A.08.010(1)(b)." *Goble*, 131 Wn. App. at 202. We reversed his conviction, holding that the jury instruction on knowledge was "confusing, misleading, and a misstatement of the law." *Goble*, 131 Wn. App. at 202. We further held that because the instruction "allowed the jury to presume Goble knew [the officer's] status . . . if it found Goble had intentionally assaulted [the officer]," the instruction "conflated the intent and knowledge elements . . . into a single element and relieved the State of its burden of proving that Goble knew [the officer's] status if it found the assault was intentional."[4] *Goble*, 131 Wn. App. at 203.

¶28 Here, jury instruction 6 stated, "A person commits the crime of assault in the second degree when he or she intentionally assaults another and thereby recklessly inflicts substantial bodily harm." CP at 29 (emphasis omitted). Jury instruction 10 defined "recklessness" and stated, "Recklessness also is established if a person acts intentionally." CP at 33. RCW 9A.08.010(1)(c) defines "recklessness": "A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful

---

[4] We also held that Goble did not waive the issue by failing to object to the instruction because if the instruction relieved the State of its burden to prove the knowledge element "then this error is of constitutional magnitude." *Goble*, 131 Wn. App. at 202-03. Here, the State does not argue that Hayward waived his challenge to jury instruction 10. Nevertheless, we hold that, because jury instruction 10 relieved the State of its burden to prove the recklessness element, the error was of a constitutional magnitude and, therefore, ripe for appeal. RAP 2.5(a)(3).

act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(2) allows for the substitution of mental states, "When a statute provides that criminal negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally, knowingly, or recklessly. When recklessness suffices to establish an element, such element also is established if a person acts intentionally or knowingly."

¶29 It is unclear from the record whether the second paragraph of jury instruction 10 was based on former WPIC 10.03, which stated in part, "[Recklessness also is established if a person acts [intentionally] [or] [knowingly].]." 11 WPIC 10.03, at 153 (alterations in original). In July 2008, WPIC 10.03 was revised "to more closely follow the statutory language." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.03 cmt. at 211 (3d ed. 2008); *see also* 11 WPIC 10.03 note on use at 209 (2008). The revised WPIC 10.03 states, "[When recklessness [as to a particular [result][fact]] is required to establish an element of a crime, the element is also established if a person acts [intentionally] [or] [knowingly] [as to that [result] [fact]].]." 11 WPIC 10.03, at 209 (2008) (alterations in original).

¶30 Hayward argues that jury instruction 10 failed to "place any limitation on the intentional acts that could establish the [required] recklessness." Br. of Appellant at 8. He argues that "the instruction did not reflect 'the exact language of the statute,'" Reply Br. of Appellant at 2 (quoting Br. of Resp't at 5), where RCW 9A.08.010(2) states that "[w]hen recklessness suffices to establish an element, such element also is established if a person acts intentionally or knowingly," while jury instruction 10 states that "[r]ecklessness also is established if a person acts intentionally." CP at 33. Thus, Hayward apparently argues that the second paragraph of jury instruction 10 should have read, Recklessness is also established if a person acts intentionally *to cause substantial bodily harm.*

¶31 We agree with Hayward that the jury instruction here impermissibly allowed the jury to find Hayward recklessly inflicted substantial bodily harm if it found that Hayward intentionally assaulted Baar. As in *Goble*, this instruction conflated the intent the jury had to find regarding Hayward's assault against Baar with an intent to cause substantial bodily harm required by the recklessness mental state into a single element and relieved the State of its burden of proving Hayward recklessly inflicted substantial bodily harm. 131 Wn. App. at 203.

¶32 Furthermore, we hold that the presumption created by the second paragraph of jury instruction 10 violated Hayward's due process rights because it relieved the State of its burden to prove that he *recklessly* inflicted substantial bodily harm, a separate element of the charged crime. *Thomas*, 150 Wn.2d at 844.

¶33 We note that this court held otherwise in *State v. Keend*, 140 Wn. App. 858, 166 P.3d 1268 (2007), *review denied*, 163 Wn.2d 1041 (2008). In *Keend*, the court affirmed Keend's conviction for second degree assault where Keend punched Daniel Reeves, breaking Reeves' jaw. The jury was similarly instructed that " '[r]ecklessness also is established if a person acts intentionally or knowingly.' " *Keend*, 140 Wn. App. at 862 (alteration in original) (quoting *Keend* Clerk's Papers at 33). The court determined that the instruction did not create a mandatory presumption, relying on former WPIC 10.03 (1994). *Keend*, 140 Wn. App. at 862.

¶34 But *Keend*, decided in 2007, did not have the benefit of the 2008 amended WPIC 10.03. The revision to WPIC 10.03, carried out in order "to more closely follow the statutory language," shows that the previous version of WPIC 10.03 (1994) did not adequately follow RCW 9A.08.010. 11 WPIC 10.03, at 211 (2008). Had this court considered *Keend* after the amendment, it may have reached a different result.

¶35 Furthermore, WPICs are not the law; they are merely persuasive authority. *State v. Mills*, 116 Wn. App.

106, 116 n.24, 64 P.3d 1253 (2003), *rev'd on other grounds*, 154 Wn.2d 1, 109 P.3d 415 (2005). Where a WPIC is in conflict with the applicable statute, the jury instruction must follow the statutory language. *See Goble*, 131 Wn. App. at 202-03; *see also State v. Beel*, 32 Wn. App. 437, 443-44, 648 P.2d 443 (1982). While jury instruction 10 mirrored former WPIC 10.03 (1994), it did not adequately follow RCW 9A.08.010(2), as evidenced by the 2008 amendment to WPIC 10.03. Without language limiting the substituted mental states (here, intentionally) to the specific element at issue (here, infliction of substantial bodily harm), as required by RCW 9A.08.010(2) and revised WPIC 10.03 (2008), jury instruction 10 violated Hayward's constitutional right to due process by creating a mandatory presumption and relieved the State of its burden to prove Hayward recklessly (or intentionally) inflicted substantial bodily harm.

C. No Harmless Error

¶36 Even if a jury instruction "omits an element of the charged offense or misstates the law," it does not necessarily require reversal. *Thomas*, 150 Wn.2d at 844. Such an erroneous jury instruction is subject to harmless error analysis. *Thomas*, 150 Wn.2d at 844. Therefore, we must next determine whether the erroneous jury instruction was harmless.

¶37 "[A]n erroneous jury instruction that omits an element of the charged offense or misstates the law is subject to harmless error analysis." *Thomas*, 150 Wn.2d at 844 (citing *Neder v. United States*, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). "Constitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). In cases involving "omissions or misstatements of elements in jury instructions, 'the error is harmless if that element is supported by un-

controverted evidence.' "[5] *Thomas*, 150 Wn.2d at 845 (quoting *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002)).

¶38 Here, the only uncontroverted evidence relating to recklessness included that (1) Hayward admitted that he intentionally struck Baar; (2) Hayward was not drinking the night of the incident; (3) Baar had been drinking; and (4) Baar suffered significant injury to his jaw requiring surgery.[6] This uncontroverted testimony is not sufficient to support a finding that Hayward recklessly inflicted sub-

---

[5] Hayward cites to *Yates v. Evatt*, 500 U.S. 391, 403, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) and argues that unconstitutional presumptions in jury instructions "require a more thorough harmless error analysis than other unconstitutional instructions." Br. of Appellant at 11. In *Yates*, the United States Supreme Court set out a two part analysis for unconstitutional presumptions in jury instructions. First, the reviewing court "must ask what evidence the jury actually considered in reaching its verdict," analyzing the jury instructions and applying the "customary presumption that jurors follow instructions and . . . that they consider relevant evidence on a point in issue when they are told that they may do so." *Yates*, 500 U.S. at 404.

Second, the reviewing court must "weigh the probative force of that evidence as against the probative force of the presumption standing alone." *Yates*, 500 U.S. at 404. The Court emphasized that it is not enough "that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue . . . is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption." *Yates*, 500 U.S. at 404 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)).

Furthermore, the Court cautioned that reviewing the entire record before judging the harmlessness of an error assumes that "the jury considered all the evidence bearing on the issue in question before it made the findings on which the verdict rested." *Yates*, 500 U.S. at 405. "If, on the contrary, that assumption were incorrect, an examination of the entire record would not permit any sound conclusion to be drawn about the significance of the error to the jury in reaching the verdict." *Yates*, 500 U.S. at 405. Therefore, before applying the two part harmless error analysis, a reviewing court must "ascertain from the trial court's instructions that the jurors, as reasonable persons, would have considered the entire trial record, before looking to that record to assess the significance of the erroneous presumption." *Yates*, 500 U.S. at 406.

Because we hold that the jury instruction was harmful under the standard harmless error test, we need not consider the more stringent *Yates* test.

[6] There was conflicting testimony regarding the character of the punch: Muck, Mellott, and Hayward testified that Hayward struck Baar with his left hand. Baar and Potter testified that Hayward struck Baar with his right hand. Hayward testified that he struck Baar with a slightly opened fist, but Muck testified that he struck Baar with a closed fist. Hayward testified that he did not use his full strength; Muck testified that the punch was "a good hit." RP (Apr. 7, 2008) at 51.

stantial bodily harm on Baar. The State lists additional evidence supporting the jury's finding that Hayward was reckless, including the uncontroverted evidence that Hayward "intentionally assaulted Mr. Baar and in doing so, inflicted substantial bodily harm" because (1) Baar was spitting blood after the punch, (2) Baar went to the hospital, (3) Baar was diagnosed with a broken jaw and sent to Harborview Medical Center to undergo surgery, and (4) Baar's jaw was wired shut and he was unable to eat solid foods or to talk. Br. of Resp't at 9. But this evidence supports only the fact that Baar suffered substantial injuries, not that Hayward acted recklessly in inflicting those injuries.

¶39 Because the uncontroverted evidence regarding Hayward's recklessness is insufficient to support a finding that Hayward acted recklessly, the State has not carried its burden to show that the error was harmless. It is not clear beyond a reasonable doubt that the outcome would have been the same without the erroneous jury instruction.

¶40 We, therefore, hold that jury instruction 10 violated Hayward's right to due process and we reverse Hayward's conviction and remand for further proceedings. Because the following issues may arise on retrial, we briefly address them.

II. Opinion Testimony

¶41 Hayward also argues that Wallace's opinion testimony that Baar "suffered a 'substantial loss or impairment of the function of a bodily part' " violated his constitutional right to a jury trial. Br. of Appellant at 14 (emphasis omitted) (quoting RP (Apr. 8, 2008) at 40). He argues that Wallace "testified that a legal element had been satisfied, using the language set forth in the court's jury instructions." "This testimony was more than [a] 'nearly explicit' or 'almost explicit' " statement of an ultimate issue and, therefore, was forbidden. Br. of Appellant at 15.

¶42 The State argues that "Wallace never mentioned [Hayward] in any of his testimony" and never stated an

opinion as to Hayward's guilt. Br. of Resp't at 10. The State also argues that, even if the testimony was impermissible, any error was harmless because "[t]he evidence in the instant case was overwhelming that [Hayward] struck Mr. Baar in the jaw breaking his mandible." Br. of Resp't at 12.

A. Standard of Review

¶43 The trial court has considerable discretion when admitting or excluding evidence. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). Witness opinion testimony is typically limited because it invades the jury's exclusive province. *Demery*, 144 Wn.2d at 759. We consider a trial court's admission or rejection of testimony, including expert testimony, for an abuse of discretion. *State v. Ortiz*, 119 Wn.2d 294, 308, 831 P.2d 1060 (1992); *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990).

B. No Improper Statement of Guilt

¶44 Expert witnesses may testify in the form of an opinion. ER 702. "Evidence is admissible under ER 702 if the witness qualifies as an expert and the expert testimony would be helpful to the jury." *State v. We*, 138 Wn. App. 716, 724-25, 158 P.3d 1238 (2007), *review denied*, 163 Wn.2d 1008 (2008). But expert witnesses may not testify as to a defendant's guilt. *State v. Olmedo*, 112 Wn. App. 525, 530, 49 P.3d 960 (2002). "Such an improper opinion undermines a jury's independent determination of the facts, and may invade the defendant's constitutional right to a trial by jury." *Olmedo*, 112 Wn. App. at 530-31; *see also State v. Kirkman*, 159 Wn.2d 918, 927-28, 155 P.3d 125 (2007).

¶45 A witness may not offer opinion testimony by a direct statement or by inference regarding the defendant's guilt, but testimony is not objectionable simply because it embraces an ultimate issue the trier of fact must decide. *See* ER 704; *Demery*, 144 Wn.2d at 759. "The fact that an opinion encompassing ultimate factual issues *supports* the conclusion that the defendant is guilty does not make the testimony an improper opinion of guilt." *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993).

¶46 Here, the prosecutor asked Wallace, "In your opinion, is the injury that Mr. Baar sustained, is that one that would be a temporary but substantial loss or impairment o[f] the function of a body part?" Hayward objected to the question, arguing that it "calls for a legal conclusion." RP (Apr. 8, 2008) at 38-39. The trial court excused the jury and the prosecutor argued that ER 704 allowed for the question. Hayward responded:

> Your Honor, there's been ample evidence through Mr. Baar's testimony and now through Dr. Wallace's testimony regarding what injuries Mr. Baar suffered, and what the effects of those injuries were. [I]t's up to the jury to draw some conclusion as to whether that meets the legal standard of . . . a substantial though perhaps temporary loss of function of a body part. . . . The question asked just deals clearly with the legal standard.

RP (Apr. 8, 2008) at 39-40. The trial court determined that the question was admissible under ER 704, stating, "I don't think the . . . doctor is giving an opinion as to guilt[ ]. He's giving a medical opinion." It noted that, given the facts of the case, the medical opinion "[i]s something that's not very difficult for him to give." RP (Apr. 8, 2008) at 40. In the presence of the jury, the prosecutor asked the question again and Wallace answered, "Yes."[7] RP (Apr. 8, 2008) at 40-41.

¶47 The "to convict" instruction required the jury to find that Hayward had "recklessly inflicted substantial bodily harm" on Baar. CP at 30. Jury instruction 8 defined "substantial bodily harm" as "bodily injury that involves a temporary but substantial disfigurement, or that causes a *temporary but substantial loss or impairment of the function of any bodily part* or organ, or that causes a fracture of any bodily part." CP at 31 (emphasis added).

¶48 Though Wallace's testimony addressed an ultimate issue of substantial bodily harm that the jury was required

---

[7] Wallace further testified that "there is considerable pain involved [and] the mandible can't be used for this period of time, during the healing, which greatly limits one's ability to communicate. . . . [S]o this is a substantial loss of function of that body part, definitely." RP (Apr. 8, 2008) at 41.

to decide in determining Hayward's guilt, his testimony did not include an opinion as to Hayward's guilt. Indeed, it did not include any discussion of Hayward or his participation in the injury. Testimony is not objectionable simply because it involves an ultimate issue. ER 704; *Demery*, 144 Wn.2d at 759; *Heatley*, 70 Wn. App. at 579. Because Wallace did not directly discuss Hayward's guilt, his testimony regarding an ultimate issue was not improper.

C. Harmless Error

¶49 Furthermore, any error in admitting Dr. Wallace's testimony was harmless. A trial court's decision to admit evidence is subject to harmless error analysis. *See Guloy*, 104 Wn.2d at 432. "Where evidence is improperly admitted, the trial court's error is harmless 'if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole.'" *State v. Yates*, 161 Wn.2d 714, 764, 168 P.3d 359 (2007) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)), *cert. denied*, 128 S. Ct. 2964 (2008). A constitutional error is harmless if the reviewing court is "convinced beyond a reasonable doubt any reasonable jury would have reached the same result absent the error." *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996).

¶50 Here, there was overwhelming evidence that Baar suffered a substantial loss or impairment of the function of his jaw. Baar testified that doctors placed "three metal plates in [his] jaw and did surgery on it." RP (Apr. 7, 2008) at 65. His jaw was wired shut for a "[m]onth and a half, two months." RP (Apr. 7, 2008) at 67. Baar was required to maintain a liquid diet while his jaw was wired shut. Smith testified that, on the morning of March 25, Baar "couldn't hardly talk" and that "he couldn't hold his jaw up . . . so he was holdin' it . . . and it was all swollen up." RP (Apr. 7, 2008) at 92. After the surgery, Smith testified that Baar could not talk and that he had to "eat through a straw." RP (Apr. 7, 2008) at 100. Wallace testified that Baar's jaw was broken on both sides. Baar required "a

surgical stabilization of his jaw to allow it to heal over the following months." RP (Apr. 8, 2008) at 36. This involved wiring Baar's jaw shut. Wallace testified that the average time a person is unable to talk or eat normal foods during the reparation of a broken jaw is approximately one month. Finally, Wallace stated, "[O]f course there is considerable pain involved in this." RP (Apr. 8, 2008) at 41.

¶51 Because there was overwhelming evidence that Baar suffered a substantial loss of the function of his jaw, a reasonable jury would have reached the same determination regarding that element of the crime. Therefore, we hold that any error in admitting this evidence was harmless.

¶52 We reverse Hayward's conviction and remand for further proceedings.

HOUGHTON and PENOYAR, JJ., concur.