# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, <br><br> Respondent, <br><br> v. <br><br> EVARISTO MENDEZ, <br><br> Appellant. | No. 78392-1-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION <br><br> FILED: January 27, 2020 |

DWYER, J. — Evaristo Mendez appeals his conviction for first degree assault of a child. He argues that the State failed to prove that he intentionally assaulted and recklessly inflicted great bodily harm to his child. He further argues that the trial court erred in denying his motion for arrest of judgment because it applied an incorrect legal standard. We affirm.

I

On the evening of December 30, 2016, Evaristo Mendez was at home in Ferndale caring for his two sons, five-month-old Z.M. and two-year-old C.M., while Kaisha Mendez, his wife and the childrens' mother, was at work. Z.M. had been fussy that evening, refusing to eat or sleep, and Mendez had been unsuccessful in soothing him. After trying different ways to calm his son, Mendez, growing frustrated, placed him in a Rock 'n Play, a type of swing chair, and pushed it back and forth. Mendez pushed too aggressively on the Rock 'n Play, however, and Z.M. flew out of the chair, landing on his head.

When Z.M.'s mother Kaisha[1] arrived home from work, Z.M. was in the Rock 'n Play crying. She noticed that the right side of his face appeared "droopy," and that he did not want to feed, which was unusual. During the night, Z.M. began to vomit. The next morning, Kaisha took Z.M. to the emergency room at St. Joseph's Medical Center in Bellingham, while Mendez stayed home with C.M. Over the course of the next 10 days, Kaisha took Z.M. to the doctor three more times without receiving a satisfactory diagnosis, while Z.M. became dehydrated and continued to vomit. On January 10, 2017, at the suggestion of one of the doctors, Kaisha took Z.M. to Seattle Children's Hospital (Children's). Throughout this period of time, Mendez said nothing to Kaisha about what happened on the evening of December 30.

At Children's, Z.M. was evaluated with a computerized axial tomography scan of his head, magnetic resonance imaging, and other tests. The imaging revealed that Z.M. had blood pooled behind his eyes, fluid surrounding his brain, and clots in the small bridging veins that surround the brain. Because excess fluid surrounding the brain can cause significant brain damage, neurosurgeons recommended draining some of the fluid to reduce the pressure on Z.M.'s brain. On January 12, neurosurgeons placed an external drain to remove fluid surrounding Z.M.'s brain. The drained fluid was bloody, confirming a diagnosis of head trauma. The fluid was allowed to drain for about four days. Z.M. stayed at Children's until January 20, 2017.

---

[1] For clarity, we refer to the defendant by his last name and to his wife as Kaisha.

2

Before Z.M.'s surgery, Kaisha met with a family advocate at Children's. The advocate explained that she was involved with the team treating Z.M. because the tests on Z.M. "weren't adding up to [being] something medical." Kaisha was shocked, because she "didn't know anything had happened" to Z.M. After Z.M.'s surgery, Kaisha met with law enforcement officers who asked her "a lot of questions that [she] didn't have an answer to."

On January 12, 2017, a social worker at Children's contacted Child Protective Services and law enforcement. On January 17, Detective Melanie Campos of the Ferndale Police Department interviewed Kaisha at Children's Hospital. Mendez had returned to work by then, so Campos did not interview him at Children's. The next day, Campos telephoned Mendez to ask if he was willing to meet her in Bellingham and take a polygraph test. Mendez agreed.

Mendez met with Detective Jana Bouzek of the Bellingham Police Department on January 20, 2017. Bouzek interviewed Mendez before starting the polygraph examination while Campos watched on a television monitor in another room. Bouzek told Mendez that if he knew something about what happened to Z.M. that he had not yet told anyone, he should tell her now, because the doctors needed to know in order to treat his son. Mendez said that there was something he had not told anyone, which was that he had been rocking Z.M. in the Rock 'n Play about a week before Z.M. started vomiting, and the bottom of it got caught on the carpet, causing Z.M. to fall out. Under further questioning, Mendez admitted that the incident was not a week prior to Z.M.'s illness, but, rather, had taken place the evening immediately before Z.M. was first

taken to the hospital. In addition, he disclosed that he had been rocking Z.M. in the Rock 'n Play harder than he should have, and that in the course of Mendez handling the device, Z.M. had fallen out and landed on his head.

Campos then joined the interview to get more details from Mendez. Mendez explained that Z.M. was fussy that evening and he had tried a number of techniques to soothe and console him, without success. Mendez told Campos that he had been frustrated and overwhelmed, that he had pushed the Rock 'n Play harder than he intended to, and that Z.M.'s head hit a plastic piece on the Rock 'n Play two or three times[2] before Z.M. eventually flew out of it and landed on his head about two feet away. After the interview, Campos visited the Mendez home and made a video of Mendez demonstrating how he pushed the Rock 'n Play on the night Z.M. was injured.

Mendez spoke with Kaisha on the telephone after the interview with Campos and Bouzek. He told her that Z.M. had fallen out of the Rock 'n Play because it got caught on the carpet. He cried and kept repeating that he was sorry. Kaisha told Mendez that he needed to tell both her parents and his parents. That evening, after the family had dinner at Kaisha's parents' home, Mendez spoke privately to Kaisha's father, John Lobach. Mendez told Lobach that he had caused the injuries to Z.M. Mendez said that he "got mad, upset. The baby wouldn't stop crying," and that Mendez "pushed the little rocking seat that [Z.M.] was in so hard that it flipped over, and the baby flew out."

---

[2] At trial, Mendez testified that, after his meeting with Campos he saw that the plastic parts of the Rock n' Play were in a different position than he had thought they were in at the time of his meeting with Campos. Having seen the Rock 'n Play again after the meeting, he said he no longer thought that Z.M. had hit his head on those parts of the device.

The State charged Mendez with first degree assault of a child. At trial, the State presented expert testimony from Dr. Emily Brown, a pediatrician at Children's, about the cause and nature of Z.M.'s injuries.[3] Dr. Brown testified that after Z.M.'s treating physicians found fluid and bleeding surrounding his brain they asked her to "provide an opinion as to whether [Z.M. had] been abused or not." Dr. Brown agreed that one of the risks for a five-month-old child in Z.M.'s condition was the possibility of death, testifying that this was "the biggest concern." She testified that although it was difficult to say with any certainty, "the concern about letting pressure continue to accumulate . . . is that [Z.M. could] have significant irreversible brain damage or even death." Dr. Brown testified that she could not quantify the probability of death in a case like Z.M.'s, given that "he had intervention in order to prevent that from happening."

The State showed Dr. Brown the video of Mendez demonstrating how he was moving the Rock 'n Play before Z.M. fell out of it. Asked whether, in her medical opinion, the video explained Z.M.'s injury, she answered "no." Dr. Brown opined that the forces required to cause the type of head injury that Z.M. had "are far more significant than what was displayed in the video." She testified that more and harder shaking would be required and "the head [would be] moving relative to the child's body.[4]

Dr. Brown testified that the surgical drain reduced the fluid around Z.M.'s brain to an acceptable level, and that, between the time of his injury and the time

---

[3] The defense raised no objection to Dr. Brown's expert qualifications or to any of her testimony.

[4] Dr. Brown also agreed that this process, which typically involves rapid acceleration and deceleration forces, is the basis of "the concept of shaking a baby."

of trial, he had "caught up developmentally to where he was." Z.M. would, however, be susceptible to long-term challenges, such as poor mental development, which might not be revealed until Z.M. was school-age.

Mendez testified in his defense. He explained that on the evening of December 30, he was feeling "really overwhelmed [and] a little bit of frustration," because he could not calm or soothe Z.M. In his frustration, he pushed the Rock 'n Play more aggressively than he had intended. Mendez pointed to the "little plastic part on the part of the leg" of the device, and testified that this part got caught on the carpet, which caused it to flip over. He said that he had never intentionally hurt his children and that he had not intended to hurt Z.M. He stated that he did not tell Kaisha what happened because he did not want to seem like a bad father.

Mendez admitted that despite being asked at Children's about what happened to Z.M., he did not say anything about the incident until he met with Campos and Bouzek on January 20, the day Z.M. was discharged. He also admitted that he had "downplay[ed]" the event during his discussions with the detectives. Mendez explained that he was initially silent about the incident because he had only "a slight suspicion" that his actions were responsible for Z.M.'s vomiting and he did not "realize what had happened would cause something like that." He also "didn't want everyone to see me as a bad father, and I know I'm not a bad father."

Mendez did not provide consistent answers regarding the veracity of his statements to the detectives or his demonstration in the video. At times during

his testimony, he agreed that his handling of the Rock 'n Play was more "aggressive" than what was shown in the video or what he told the detectives. At other times, he insisted that he told the detectives the truth and that his video demonstration accurately portrayed how he had pushed the device.

The jury found Mendez guilty of first degree assault of a child. Mendez filed a motion to arrest the judgment, which the court denied. The court sentenced Mendez to a standard range sentence of 96 months, followed by three years of community custody, including a 10-year no-contact order as to Z.M.

Mendez appeals.

## II

Mendez contends that the evidence adduced at trial was insufficient to prove that he knew his actions created a substantial risk of great bodily harm to Z.M. He also contends that the trial court erred in denying his motion for arrest of judgment because it applied the wrong legal standard in ruling on the motion.

Mendez first avers that the State failed to prove the essential elements of the crime of assault of a child in the first degree. Specifically, Mendez asserts that the State did not prove that he knew that aggressively pushing the Rock 'n Play could result in great bodily harm to Z.M.

The State bears the burden of proving all the elements of an offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); U.S. Const. amend. XIV, § 1; Wash. Const. art. I, § 3. In evaluating a challenge to the sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the State, any rational

trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "The challenge 'admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom,' and leaves determinations of witness credibility to the fact finder." State v. Houston-Sconiers, 188 Wn.2d 1, 15, 391 P.3d 409 (2017) (quoting State v. Drum, 168 Wn.2d 23, 35, 225 P.3d 237 (2010)). We "defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

A

In order to convict Mendez of first degree assault of a child, the State had to prove that Mendez intentionally assaulted Z.M. and recklessly inflicted great bodily harm. RCW 9A.36.120(1)(b). Mendez's conduct was reckless if he knew of and disregarded a substantial risk that great bodily harm might occur and his disregard of that risk was a gross deviation from conduct that a reasonable person would exercise in the same situation. See RCW 9A.08.010(1)(c). To prove "great bodily harm," the State had to prove that Z.M. suffered bodily injury that created a probability of death, caused significant serious permanent disfigurement, or caused a significant permanent loss or impairment of the function of any bodily part or organ. RCW 9A.04.110(4)(c).

Recklessness has both subjective and objective knowledge components. Whether an act is reckless depends on both what Mendez knew and how a reasonable person would have acted knowing these same facts. State v. R.H.S., 94 Wn. App. 844, 847, 974 P.2d 1253 (1999). The jury is permitted to find actual

subjective knowledge of a fact if there is sufficient information that would lead a reasonable person to believe the fact exists. State v. Johnson, 119 Wn.2d 167, 174, 829 P.2d 1082 (1992).

Mendez contends that the evidence showed only that he intentionally pushed the Rock 'n Play, and that Z.M. later vomited, needed surgery to drain fluid surrounding his brain, and might have "some developmental impairment as he ages." Mendez asserts that this evidence supports a conclusion that Z.M. was harmed, but not a conclusion that he acted recklessly in inflicting the injuries.

In support, Mendez relies in part on State v. Hayward, 152 Wn. App. 632, 217 P.3d 354 (2009). In Hayward, Division Two held that a jury instruction improperly allowed the jury to find that the defendant recklessly inflicted substantial bodily harm if it determined that the defendant intentionally assaulted the victim.[5] Hayward, 152 Wn. App. at 645. The court stated that this presumption was impermissible because it relieved the State of its burden of proving recklessness, violating Hayward's due process rights. Hayward, 152 Wn. App. at 645. The error was not harmless, the court reasoned, because the only uncontroverted evidence relating to recklessness was not sufficient to support a finding that Hayward recklessly inflicted substantial bodily harm on the victim. Hayward, 152 Wn. App. at 646-48. The court rejected the State's

---

[5] The problematic jury instruction in Hayward defined recklessness and further stated that "[r]ecklessness also is established if a person acts intentionally." Hayward, 152 Wn. App. at 643. This language was formerly included in 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.03 (2d ed. 1994) (WPIC). In 2008, the Washington Pattern Instruction Committee amended the instruction to more closely follow the relevant language in RCW 9A.08.010(2). See Hayward, 152 Wn. App. at 644. In this case, the jury was instructed that "[w]hen recklessness *as to a particular result* is required to establish an element of a crime, the element is also established if a person acts intentionally *as to that result*." (Emphasis added.) This language avoids the impermissible presumption repudiated by the court in Hayward.

9

assertion that additional evidence it listed supported the jury's finding of recklessness, explaining that it "supports only the fact that [the victim] suffered substantial injuries, not that Hayward acted recklessly in inflicting those injuries." Hayward, 152 Wn. App. at 648.

Contrary to Mendez's assertions, Hayward did not involve a challenge to the sufficiency of the evidence; it involved a challenge to a jury instruction. See Hayward, 152 Wn. App. at 641. Nor does Hayward's harmless error analysis shed light on whether the evidence in this case is sufficient to sustain the jury's verdict. The harmless error analysis in Hayward assessed whether there was uncontroverted evidence supporting the jury's finding of recklessness and determined there was not. In making this determination, the court rejected the additional evidence listed by the State, because it related only to the victim's injuries, not to the defendant's actions. Hayward, 152 Wn. App. at 648.

Both the State and Mendez compare this case to State v. Harris, 164 Wn. App. 377, 263 P.3d 1276 (2011). There, the court determined that a reasonable juror could find that the defendant knew, but disregarded, the substantial risk that shaking a two-month-old baby could cause great bodily harm. Harris, 164 Wn. App. at 391. Defendant Harris admitted that he had picked up and shaken his infant son because the baby was about to cry and Harris "didn't want to hear it." Harris, 164 Wn. App. at 380-81. Harris also said that on occasion he would pick up his son too quickly and without properly supporting the baby's head, which would then "fling back." Harris, 164 Wn. App. at 391. He said that the boy's mother yelled at him about this and taught him how to properly pick up and hold

the baby. The court held that a jury could conclude that Harris knew how to properly hold an infant and knew that not handling the infant properly could result in serious injury. Harris, 164 Wn. App. at 391.

Mendez argues that here, unlike in Harris, the evidence shows that he regularly pushed the Rock 'n Play in the manner he was pushing it the night Z.M. was injured and that no harm came to Z.M. on those other occasions. He also argues that, unlike in Harris, the evidence here showed Kaisha had often seen him push the Rock 'n Play in the same manner, yet she did not stop him or correct him.[6] Thus, Mendez concludes, there was insufficient evidence that he knew that forcefully pushing Z.M. in the Rock 'n Play could cause serious injuries.

The State counters that Harris supports the jury's finding of recklessness. The State notes that, as with the defendant in Harris, Mendez was one of Z.M.'s primary caregivers and he cared for Z.M. daily while Kaisha was at work. Cf. Harris, 164 Wn. App. at 391. Although Mendez testified that he had previously calmed and soothed Z.M. and did not intend to hurt him, Mendez admitted that, on December 30, he behaved differently with Z.M. than he had on earlier occasions. Specifically, he put Z.M. in the Rock 'n Play and pushed it back and forth on the carpet harder than he intended to or had before. He conceded that he pushed it "maybe too aggressively," "more violent[ly] than what [he] showed the detectives," and using "more force than anticipated." Mendez admitted that

---

[6] When asked as to whether she had concerns with Mendez's handling of the chair before Z.M.'s fall, Kaisha stated, "Not at that point. It's a subtle push. There's a harness in there to keep him locked in." According to Detective Campos, Mendez admitted that on the night in question, Z.M. "was not buckled in the Rock 'n Play."

his son was "flinging around," that his head "hit[] the sides" of the Rock 'n Play, and that he continued to "shake" the Rock 'n Play until it flipped over and ejected his son.[7] Mendez said that this was "just something that I wouldn't do normally," but "gradually as my frustration built up at the situation, . . . I just was more aggressive than I would ever be, you know."

Thus, the evidence demonstrated that, similar to the defendant in Harris, Mendez was irritated and he handled his son in a way he ordinarily would not have. Cf. Harris, 164 Wn. App. at 380-81, 390-91. In addition, the evidence showed that Mendez did not tell anyone, even Kaisha, what had happened on the evening of December 30, until January 20, 2017, moments before he was scheduled to take a polygraph examination. Campos testified that Mendez told her he realized "something had happened" right away after Z.M. was thrown from the Rock 'n Play and he "immediately regretted his actions." Mendez testified that he kept the incident to himself despite knowing that Kaisha and Z.M.'s treating doctors wanted to know what had happened to Z.M., and despite suspecting that his actions may have caused Z.M.'s injuries.

Moreover, although Mendez claimed that Z.M. was his "main concern" and "the most important thing," he admitted that the reason he chose to say nothing was that he felt "embarrassed" and, as "a good father," he did not want "everyone to see [him] as a bad father." Mendez testified that he ultimately decided to tell

---

[7] Mendez agues in his reply brief that this case is unlike Harris, because Mendez "did not intentionally shake Z.M." Rather, "he pushed the Rock 'n Play which resulted in Z.M. being unintentionally jostled." Mendez in fact admitted that he "shook" the Rock 'n Play and caused Z.M.'s body to "fling" around in it. Mendez also did not object to the State's many references in closing argument to Mendez shaking Z.M. We therefore reject his argument that this case is distinguishable from Harris in this respect.

the detectives what he had done because they said that any information he had would help his son and "because [he] was willing to do anything at that point." But Mendez did not decide to disclose what he had done until January 20, 2017, which, as he knew, was the day Z.M. was being discharged from Children's. Thus, his belated disclosure was of no benefit to the doctors who had been treating Z.M.

In sum, the jury heard substantial evidence about how and why Mendez pushed Z.M. in the Rock 'n Play on the evening of December 30, 2016, and how he concealed his knowledge throughout the period of time Z.M. was being treated out of concern for how it would reflect on him. A reasonable juror could conclude from this evidence that Mendez knew how to properly handle Z.M. and chose immediately to conceal his actions due to his concern that others would deem him responsible for his son's injuries. Thus, construing the evidence in the light most favorable to the State, a reasonable juror could conclude beyond a reasonable doubt that Mendez knew of and disregarded a substantial risk that great bodily harm might occur and his disregard of that risk was a gross deviation from conduct that a reasonable person would exercise in the same situation.

B

Mendez contends that the evidence is insufficient to support the jury's finding that he recklessly inflicted great bodily harm.[8] Specifically, he maintains

---

[8] Mendez did not specifically raise this issue in his assignments of error and issues presented on appeal. However, Mendez did raise the issue of whether Z.M. suffered great bodily harm in the context of his argument that the evidence was insufficient to prove that he knew of and disregarded a risk of great bodily harm. Mendez also assigned error broadly to whether the State proved the elements of the crime beyond a reasonable doubt. The State responded to Mendez's argument and thus has not been prejudiced. We conclude therefore that Mendez

that the evidence did not establish that Z.M. has any permanent impairment or brain damage but, rather, showed only a possibility of developmental issues manifesting in the future. He notes that Dr. Brown did not testify that death was a probable result of Z.M.'s injuries or that Z.M. was exhibiting any impairment at the time of trial. Thus, he concludes, there was insufficient evidence of a permanent impairment of a bodily organ or function, and no evidence of a probability of death. We disagree.

Dr. Brown's testimony, viewed in the light most favorable to the State, was sufficient to support the jury's conclusion that Z.M. suffered great bodily harm. While Dr. Brown did not expressly state that death was a probable result of Z.M.'s injuries, she testified that the risk he was facing when he was admitted to Children's was that the fluid surrounding his brain could compress his brain, resulting in "significant damage to the brain, even death." She testified that without intervention, Z.M. was at risk for "significant irreversible brain damage or even death." The reason Dr. Brown could not quantify the probability of death in Z.M.'s case was that he had surgery to drain some of the accumulated fluid and prevent his death. However, Dr. Brown did state:

> What we know from studies of children who have the type of injury that [Z.M.] has is that children [who] survive, roughly a third of them do very poorly immediately, essentially have vegetative states. Another third typically have sort of immediate sequela, so seizures or cerebral palsy, some sort of obvious sequela, and then about a third may have developmental concerns, or may not have issues that arise until they reach school age and they're having to do higher function tasks.

adequately raised the issue of whether the evidence was sufficient to prove Z.M. suffered great bodily harm.

14

Dr. Brown also testified that, although a child with Z.M.'s injury might avoid certain immediately obvious consequences, such as cerebral palsy or seizures, the child "will have some sort of impact or sequela of the traumatic head injury. . . . [C]hildren who experience this do not go on to become the children that they otherwise would have been had this not occurred." Thus, despite Dr. Brown's testimony that Z.M. did not have signs or symptoms of impairment at the time of trial,[9] a reasonable juror could conclude from her testimony as a whole that Z.M. will be significantly and permanently impaired. Furthermore, Kaisha contradicted Dr. Brown's testimony that Z.M. had no impairments at the time of trial. She testified that Z.M.'s periodic examinations and scans showed that there was still excessive fluid around his brain, that he still had blood in the back of his eyes impairing his vision, and that, developmentally, Z.M. was "behind in some areas."

Construing the evidence in the light most favorable to the State, a reasonable juror could conclude beyond a reasonable doubt that Z.M. suffered great bodily harm and that the harm was recklessly inflicted by Mendez. Sufficient evidence was adduced from which a rational jury could find the essential elements of assault of a child in the first degree proved beyond a reasonable doubt.

---

[9] Mendez also argues that the jury could not reasonably infer that Z.M. will experience permanent impairment because Dr. Brown gave conflicting testimony on the issue. But Dr. Brown's testimony that Z.M. was developmentally "caught up," and that the pressure in his eyes was resolved did not cover the full range of impairments Dr. Brown indicated were possible.

III

Mendez challenges the trial court's denial of his motion for arrest of judgment. See CrR 7.4(a)(3). Mendez asserts that the trial court erred in denying his motion, because it used the wrong legal standard in examining the sufficiency of the evidence. He bases this argument on the trial court's oral ruling that there was sufficient evidence for the jury to conclude that Mendez's actions created "a risk of substantial bodily harm," as opposed to a risk of great bodily harm.

On review of a trial court decision denying a motion for arrest of judgment, we engage in the same inquiry as the trial court. State v. Longshore, 141 Wn.2d 414, 420, 5 P.3d 1256, 1259 (2000). Under CrR 7.4(a), a defendant may bring a motion for arrest of judgment for "'insufficiency of the proof of a material element of the crime.'" State v. Ceglowski, 103 Wn. App. 346, 349, 12 P.3d 160 (2000) (quoting CrR 7.4(a)(3)). The test for insufficiency on a motion for arrest of judgment is the same as the test for sufficiency of the evidence in a criminal trial: evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in a light most favorable to the State, could find the essential elements of the charged crime beyond a reasonable doubt. See Longshore, 141 Wn.2d at 420-21.

We agree with the State that it is of no consequence that the trial court *cited* the wrong bodily injury standard; the question is whether the evidence was sufficient to support a reasonable jury's finding that Mendez's actions created a risk of great bodily harm. We have concluded that the evidence adduced by the

16

State was sufficient to support the jury's verdict. There was no error in the trial court's decision to deny the motion to arrest the judgment.

Affirmed.

We concur: