246 P.3d 558 (2011)
STATE of Washington, Respondent,
v.
Jay Earl McKAGUE, Appellant.
No. 39087-6-II.
Court of Appeals of Washington, Division 2.
January 19, 2011.
*561 Gregory Charles Link, Washington Appellate Project, Seattle, WA, for Appellant.
Carol L. La Verne, Thurston County Prosecutor's Office, Heather Stone, Attorney at Law, Olympia, WA, for Respondent.
HUNT, J.
¶ 1 Jay Earl McKague appeals his third degree theft and second degree assault jury convictions and his lifetime sentence as a persistent offender. He argues that: (1) the trial court erred by refusing his request to waive a jury; (2) the evidence was insufficient to support his second degree assault conviction; (3) a jury instruction created a mandatory presumption that improperly relieved the State of its burden of proof; (4) he was denied effective assistance of counsel because his trial counsel withdrew a proposed jury instruction on an inferior degree offense; and (5) the sentencing phase of his trial violated his state and federal due process and equal protection rights[1] because a judge, rather than a jury, found the existence of his prior convictions by a preponderance of evidence rather than beyond a reasonable doubt. We affirm his convictions and sentence.

FACTS

I. SHOPLIFT AND ASSAULT
¶ 2 On October 17, 2008, Jay Earl McKague stole a can of smoked oysters from Kee Ho Chang's grocery store in Olympia. When Chang tried to "grab" McKague in the store's parking lot, McKague repeatedly punched[2] Chang, who fell to the ground. I Verbatim Report of Proceedings (VRP) at 105. As Chang fell to the ground, McKague hit Chang several more times before jumping into a car and fleeing. When Chang "tr[ied] to get up," he "got very dizzy," and "for a while [he] couldn't get up." I VRP at 64-65. Eventually, Chang was able to stand up. Officer George Samuelson, who arrived shortly after the incident, described the left side of Chang's face as "extremely puffy." I VRP at 36. According to Detective Sam Costello, who arrived at the scene and responding to the police dispatch, Chang "app[eared] injured[] on the left side of his face and on the back of his head." I VRP at 49.
¶ 3 An emergency room medical evaluation documented Chang's injuries, which included a concussion, a scalp contusion, and neck and shoulder pain. A computerized axial tomography scan (CT scan) showed a possible occult fracture of Chang's facial bones.[3] On the day of the incident, law enforcement officers took photographs of Chang that showed bruising and swelling around his left eye, redness and swelling of his left check, lacerations on his arm, a contusion on his head, and blood on his scalp. The emergency room physician prescribed Vicodin for the pain and cautioned Chang to limit his activities for the next two weeks. Chang's private physician prescribed Chang anti-inflammatory medication. Three days later, law enforcement officers took photographs of Chang's face that showed bruising remaining around Chang's left eye.

II. PROCEDURE
¶ 14 The State charged McKague with first degree robbery, RCW 9A.56.200(1), or in the alternative second degree assault, RCW 9A.36.021(1)(a). He attempted to waive his right to a jury trial and to proceed with a *562 bench trial. The trial court refused, reasoning that: (1) McKague's counsel was very experienced with jury trials; (2) McKague's concern that a jury would try him unfairly because of his criminal history was unfounded, given that a jury would not be told about McKague's criminal history unless he chose to testify; (3) the seriousness of the charges against McKague warranted a jury trial; and (4) the appearance of fairness would be advanced by having more than one person determine McKague's culpability for such serious charges.
¶ 5 McKague requested an instruction on third degree assault as an inferior degree offense of second degree assault.[4] The State objected to McKague's request. The trial court initially agreed with the State and denied McKague's request, stating that the evidence did not support the inference that McKague acted only with criminal negligence. In response, McKague indicated that he would request a jury instruction on fourth degree assault as an inferior degree offense to second degree assault. The next day, the trial court reconsidered its previous ruling and granted McKague's request for an instruction on third degree assault. McKague did not request a fourth degree assault instruction.
¶ 6 Ultimately, the trial court gave standard jury instructions[5] on: (1) first degree robbery; (2) third degree theft as an inferior degree offense of first degree robbery; (3) second degree assault; and (4) third degree assault as an inferior degree offense of second degree assault. McKague did not challenge the language of the second degree assault instruction or argue that the wording was improper. He did not object to the trial court's instruction that "[w]hen recklessness as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally or knowingly"; nor did he argue that this instruction created an improper mandatory presumption. CP at 47.
¶ 7 In closing, McKague argued that a third degree assault conviction, rather than second degree, was appropriate because: (1) the evidence tended to show McKague's mental state was criminal negligence; and (2) the severity of Chang's injuries rose to the level of third degree assault, but not second degree. The jury found McKague guilty of second degree assault and third degree theft.
¶ 8 Based on his prior felony convictions for second degree assault, first degree kidnapping, and first degree robbery, the State had alleged that McKague was a persistent offender under RCW 9.94A.570. The trial court examined certified copies of the judgment and sentence forms from McKague's two prior "strikes,"[6] IV VRP at 309, and sentenced McKague to life imprisonment without the possibility of parole. During the sentencing hearing, McKague never asked that a jury be impaneled to determine the existence of his prior convictions nor did he challenge the trial judge's role as fact-finder for these prior convictions. And he did not dispute the existence of his prior convictions or the standard of proof that the trial court applied. See IV VRP at 306-13.
¶ 9 McKague appeals.

ANALYSIS

I. JURY TRIAL WAIVER
¶ 10 McKague first argues that the trial court erred in refusing to accept his jury trial waiver. This argument fails.
¶ 11 A defendant has no constitutional right to a nonjury trial. State v. Thompson, 88 Wash.2d 13, 15, 558 P.2d 202 (1977) (citing Singer v. United States, 380 *563 U.S. 24, 36, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965)). A defendant may waive his right to a jury trial only with the trial court's consent. CrR 6.1(a); RCW 10.01.060. The trial court has discretion to refuse a jury waiver even where both parties concur in the request for a nonjury trial. See Newsome v. Shields, 10 Wash.App. 505, 507-08, 518 P.2d 741 (1974). We review a trial court's denial of a jury trial waiver for abuse of discretion to ensure that the trial court did not merely deny the request by rote but that it exercised discretion with an eye to ensuring a fair trial. Singer, 380 U.S. at 34, 85 S.Ct. 783. An abuse of discretion occurs when the trial court's decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971) (citation omitted). We find no abuse of discretion here.
¶ 12 The trial court articulated several tenable reasons for rejecting McKague's jury waiver: the seriousness of the crime, defense counsel's jury trial expertise, and the appearance of fairness in having McKague's culpability for such a serious charge determined by more than one person. We hold, therefore, that the trial court properly exercised its discretion when it denied McKague's request to waive his jury trial rights and to be tried by the court.

II. SUFFICIENCY OF THE EVIDENCE: "SUBSTANTIAL BODILY HARM"
¶ 13 McKague next contends that the State failed to prove each element of second degree assault beyond a reasonable doubt. McKague concedes the State's evidence proves that he assaulted Chang, but he maintains that the evidence does not establish that Chang suffered substantial bodily harm as a result. We disagree.
¶ 14 In considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and ask whether any rational trier of fact could have found guilt beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992) (citing State v. Green, 94 Wash.2d 216, 220-22, 616 P.2d 628 (1980)). A claim that the evidence was insufficient admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. Salinas, 119 Wash.2d at 201, 829 P.2d 1068.
¶ 15 A conviction for second degree assault requires the State to prove beyond a reasonable doubt that a defendant intentionally assaulted another and thereby recklessly inflicted substantial bodily harm. RCW 9A.36.021(1)(a). RCW 9A.04.110(4)(b) defines "substantial bodily harm" as:
bodily injury which involves [1] a temporary but substantial disfigurement, or [2] which causes temporary but substantial loss or impairment of the function of any bodily part or organ, or [3] which causes a fracture of any bodily part.
McKague argues that the State failed to prove beyond a reasonable doubt any of these three possibilities of substantial bodily harm.
¶ 16 Specifically, McKague contends that: (1) Chang's scalp contusion and "strained shoulder" did not rise to the level of "temporary but substantial disfigurement," Br. of Appellant at 7-8; (2) Chang's "concussion without loss of consciousness" did not cause "any lack of function or impairment," Br. of Appellant at 8; and (3) Chang did not suffer a fracture because the record only establishes a "potential occult fracture." Br. of Appellant at 7. Based on this, McKague argues that the record contains insufficient evidence to convict him of second degree assault. This argument fails.

A. Bodily Injury Involving a Temporary But Substantial Disfigurement
¶ 17 McKague contends that Chang's scalp contusion and "strained shoulder" do not count as a "temporary but substantial[[7]] *564 disfigurement" under RCW 9A.04.110(4)(b). Br. of Appellant at 8. Even assuming, without deciding, that McKague is correct, his argument fails: Taking the facts in the light most favorable to the State post-conviction, a rational trier of fact could conclude that McKague inflicted other injuries besides the scalp contusion and "strained shoulder," which other injuries qualified as a "temporary but substantial disfigurement" under RCW 9A.04.110(4)(b). Br. of Appellant at 8. And we further note that visible bruising itself rises to the level of temporary substantial disfigurement. See State v. Hovig, 149 Wash.App. 1, 5, 13, 202 P.3d 318, review denied, 166 Wash.2d 1020, 217 P.3d 335 (2009) ("serious" "red and violet teeth-mark" bruising that lasted for 7 to 14 days constituted "substantial bodily injury"); see also State v. Ashcraft, 71 Wash.App. 444, 455, 859 P.2d 60 (1993) (bruises that resulted from being hit by a shoe were "temporary but substantial disfigurement").
¶ 18 Officer George Samuelson testified that when he arrived at the scene, he observed that Chang "obviously" had injuries on the left side of his face. I VRP at 36. Samuelson described Chang's face as "extremely puffy" and bruised, a bump on the back of Chang's head, and that Chang "looked like he was affected, affected by [the] blows." I VRP at 36. Detective Sam Costello confirmed that the photographs taken on the day of the incident and admitted into evidence at trial accurately reflected Chang's injuries that day. Based on these contemporaneous photos, Costello described Chang's injuries as swelling around his eye causing it to be "a little bit shut or closer shut than normal," swelling of his cheek, an abrasion on his left cheek, and a laceration on his head. II VRP at 175. Costello also testified that the photographs of Chang taken three days later showed injuries that were "consistent with that which occurred" during the incident with McKague, II VRP at 176, and that the bruising around Chang's eye had already begun to turn yellow.
¶ 19 Viewing the above facts in a light most favorable to the State, a rational trier of fact could find that McKague inflicted on Chang a "bodily injury which involves a temporary but substantial disfigurement." RCW 9A.04.110(4)(b).

B. Temporary Substantial Impairment of Bodily Part or Organ Function
¶ 20 McKague next contends that Chang's "concussion without a loss of consciousness" did not cause "any lack of function or impairment." Br. of Appellant at 8. This argument also fails: Viewed in a light most favorable to the State, the evidence establishes that a rational trier of fact could find that several of Chang's injuries, including his concussion, constituted a bodily injury that "cause[d] temporary but substantial loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(b).
¶ 21 Chang testified that, immediately after McKague punched him, he was so dizzy that for "for a while," I VRP at 65, he could not stand up. Based on Chang's inability to stand "for a while," I VRP at 65, let alone walk, after McKague had repeatedly punched him and knocked him down, a rational trier of fact could find a "temporary but substantial loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(b).
¶ 22 Additionally, Officer George Samuelson testified that when he arrived at the scene, Chang appeared disoriented and "was just a little bit off." I VRP at 36. The medical report from Chang's emergency room visit the day of the incident explained that Chang had a concussion without loss of consciousness. Chang's discharge papers included warnings about potentially dangerous symptoms for which Chang should be vigilant, complications related to his concussion, instructions to help monitor and expedite his recovery, and restrictions on various life activities over the next day and subsequent two-week period. For example, Chang was precluded from drinking alcohol, operating machinery, driving, heavy lifting and straining for at least 24 hours, and participating in *565 contact sports for at least two weeks and then only after receiving doctor approval.
¶ 23 The jury could also reasonably infer that Chang had a temporary brain impairment based on the concussion that he suffered and on Officer Samuelson's testimony that Chang seemed "a little bit off" when answering questions the night of the assault, compared to their previous contacts. I VRP at 36. According to Chang's medical records, a concussion produces both short and long-term negative health effects on the body.[8] Chang's medical records also included the following patient discharge instructions describing and relating to his concussion:
Concussion is a head injury that causes a transient loss of consciousness, without any serious brain lesion, injury, or complications. Most head injuries do not cause any serious problems and get better within several days. A Concussion may cause a moderate headache and loss of memory surrounding the head injury event. You may experience weakness, dizziness, nausea, concentration difficulties, and depression for up to a week or more after the injury. This post-injury state is called a post-concussion syndrome and usually gets better with bed rest and mild pain medicine. If any of these symptoms last for more than a week, you will need further medical attention. See your doctor or return to emergency if symptoms last longer than one week.
Ex. 34 at 6 (emphasis added). This definition identifies headaches, memory loss, and at least five brain complications that can last for an extended period of time; the last of these is classified as a medical "syndrome." Because the emergency room affirmatively diagnosed Chang with a concussion, the jury could rely on these effects' of a concussion to determine that Chang's concussion rose to the level of substantial bodily injury.
¶ 24 Chang's medical report also reflected that Chang experienced neck and shoulder pain. He received a four-day prescription for Vicodin for his severe pain. And he testified that he had "very severe" pain throughout his neck and shoulder during the week after the incident, for which his private doctor prescribed an anti-inflammatory medication, I VRP at 66, and that his neck and shoulder pain subsided but persisted for two to three months. Chang's months of shoulder and neck pain also constitute a substantial bodily injury; although pain is no longer an enumerated independent basis for substantial bodily injury, the statutory definition of "substantial bodily injury" does not preclude consideration of pain and its effects. Laws of 1988, ch. 158, § 1. Thus, the jury could reasonably infer that Chang had a loss or impairment of the use of his arm and shoulder function related to his severe neck and shoulder pain that lasted for two to three months.
¶ 25 Viewing the evidence in the light most favorable to the State, a rational trier of fact could find, beyond a reasonable doubt, that Chang suffered "a bodily injury . . . which causes temporary but substantial loss or impairment of the function of any bodily part or *566 organ" as a result of McKague's intentional assault. RCW 9A.04.110(4)(b).

C. Bodily Injury Causing a Fracture of Any Bodily Part
¶ 26 Finally, McKague argues that Chang did not suffer a fracture because the record establishes only a "potential occult fracture." Br. of Appellant at 7. Because we hold that a rational trier of fact could find substantial bodily injury under the disfigurement or impairment bases, we need not and do not reach the fracture issue. We note, however, that the record contains some evidence that Chang may have suffered a fracture: A physician concluded that the results of a CT scan performed on Chang the day of the incident "potentially indicat[ed] [an] occult fracture." Ex. 34 at 2.

III. JURY INSTRUCTIONS

A. Substantial Bodily Harm; Recklessness
¶ 27 McKague next argues that the second degree assault "to convict" instruction: (1) improperly created a mandatory presumption that if the jury found that he had intentionally assaulted Chang, he (McKague) necessarily inflicted substantial bodily harm; and (2) relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. More specifically, McKague contends that if a reasonable juror found that he intentionally assaulted Chang (element one), the jury instruction on recklessness mandated that juror to conclude that McKague had thereby inflicted substantially bodily harm (element two) because he acted intentionally. We find McKague's argument unpersuasive.
¶ 28 At the outset, we note that we will not consider allegedly erroneous instructions for the first time on appeal absent manifest error affecting a constitutional right. State v. Mills, 154 Wash.2d 1, 6, 109 P.3d 415 (2005). Although McKague requested a jury instruction on third degree assault as an inferior degree offense of second degree assault, he did not object to the wording of the second degree assault instruction below; nor did he argue below, as he does for the first time on appeal, that the recklessness instruction created an improper mandatory presumption. Because McKague's alleged error potentially rises to the level of a "manifest error affecting a constitutional right," Mills, 154 Wash.2d at 6, 109 P.3d 415, we address this issue and hold that the "recklessness" jury instruction did not create a mandatory presumption.[9]

1. Standard of review
¶ 29 We review alleged errors of law in jury instructions de novo. State v. Barnes, 153 Wash.2d 378, 382, 103 P.3d 1219 (2005). Due process requires the State to prove every essential element of the crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); State v. Deal, 128 Wash.2d 693, 698, 911 P.2d 996 (1996). A mandatory presumption is one that requires the jury to find a presumed fact from a proven fact. State v. Hayward, 152 Wash.App. 632, 642, 217 P.3d 354 (2009). Such a presumption exists if a reasonable juror would interpret the presumption to be mandatory. Hayward, 152 Wash.App. at 642, 217 P.3d 354.

2. Second degree assault and recklessness instructions
¶ 30 The trial court instructed the jury about the elements of second degree assault in this "to convict" instruction:
To convict the defendant of the crime of assault in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1). That on or about October 17, 2008, the defendant intentionally assaulted KEE HO CHANG;
(2) That the defendant thereby recklessly inflicted substantial bodily harm on KEE HO CHANG; and
(3) That this act occurred in the State of Washington.
*567 CP at 49. The trial court also instructed the jury that "[w]hen recklessness as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally or knowingly." CP at 47. McKague did not object to either of these instructions.

3. Hayward

¶ 31 Our decision in Hayward is enlightening, but not controlling here. In Hayward, the trial court instructed the jury that "[a] person commits the crime of assault in the second degree when he or she intentionally assaults another and thereby recklessly inflicts substantial bodily harm." Hayward, 152 Wash.App. at 643, 217 P.3d 354 (quoting CP at 29). We did not find error in this second degree assault instruction in Hayward.
¶ 32 We did, however, find reversible error in the Hayward trial court's additional instruction that "[r]ecklessness also is established if a person acts intentionally." Hayward, 152 Wash.App. at 643, 217 P.3d 354 (quoting CP at 33). The second degree assault instruction in Hayward contained two separate mental states, each corresponding to a separate act: (1) intentionality (assaultive act); and (2) recklessness (infliction of substantial bodily harm). Hayward, 152 Wash.App. at 643, 217 P.3d 354. But the defective "recklessness" instruction effectively collapsed second degree assault into an offense with only a single mental state (which could be satisfied with a finding of either recklessness or intentionality), rather than the required two mental states corresponding to the two discrete acts. Hayward, 152 Wash.App. at 644-45, 217 P.3d 354.
¶ 33 In other words, the defective "recklessness" instruction allowed the jury to conclude that if Hayward had intentionally assaulted the victim, then recklessness in general was established and, therefore, Hayward must have also recklessly inflicted substantial bodily harm. Hayward, 152 Wash. App. at 645, 217 P.3d 354. This conclusion was improper because, as mirrored by the Hayward trial court's assault instruction noted above, second degree assault comprises two discrete acts, each with its own mental stateintentional assault and reckless infliction of substantial bodily harm. RCW 9A.36.021(1)(a). The defective "recklessness" instruction in Hayward improperly eliminated a critical second mental element of second degree assault, thereby relieving the State of part of its burden of proof. Hayward, 152 Wash.App. at 645, 217 P.3d 354
¶ 34 Such is not the case here, however. Here, the trial court avoided this Hayward problem by giving the following correct "recklessness" instruction:
"When recklessness as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally or knowingly."
CP at 47 (emphasis added).[10] This "recklessness" instruction made clear that: (1) only if the jury found intentionality as to the discrete act of assault, could it also find recklessness as to the discrete act of assault; but (2) unlike in Hayward, the jury could not, as a consequence, also find recklessness as to the infliction of substantial bodily harm. Compare Hayward, 152 Wash.App. at 646, 217 P.3d 354. Therefore, we hold that the "recklessness" instruction did not create a mandatory presumption.

B. Lesser Included Offense
¶ 35 In his Statement of Additional Grounds,[11] McKague argues that he was denied his right to effective representation when his trial counsel withdrew a proposed jury instruction on the lesser degree crime of *568 fourth degree assault, after the trial court changed its mind and decided to instruct on third degree assault, as counsel had originally requested. McKague's argument fails.
¶ 36 We review de novo a claim that counsel ineffectively represented the defendant. State v. Thach, 126 Wash.App. 297, 319, 106 P.3d 782 (2005). To establish that counsel was ineffective, the defendant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient representation prejudiced his defense, i.e., that there is a reasonable probability that, but for the deficient performance, the results of the proceeding would have differed. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Brockob, 159 Wash.2d 311, 344-45, 150 P.3d 59 (2006) (citation omitted). We presume that defense counsel was effective, a presumption that the defendant can overcome only by showing the absence of a legitimate strategic or tactical basis for the challenged conduct. State v. McFarland, 127 Wash.2d 322, 335, 899 P.2d 1251 (1995). To establish prejudice, a defendant must show that if counsel had made the objections or arguments now embraced, they would have likely succeeded. See McFarland, 127 Wash.2d at 337 n. 4, 899 P.2d 1251.
¶ 37 An instruction on an inferior degree offense is warranted if: "(1) the statutes for both the charged offense and the proposed inferior degree offense `proscribe but one offense'; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior degree offense." State v. Fernandez-Medina, 141 Wash.2d 448, 454, 6 P.3d 1150 (2000) (quoting State v. Peterson, 133 Wash.2d 885, 891, 948 P.2d 381 (1997)). A defense counsel's decision not to request an instruction on a lesser offense, however, may constitute a legitimate trial strategy. State v. Hassan, 151 Wash.App. 209, 218, 211 P.3d 441 (2009).
¶ 38 To prove third degree assault, the State must prove that the defendant, with criminal negligence, caused bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering. RCW 9A.36.031(1)(f). In contrast, a person is guilty of fourth degree assault if, under circumstances not amounting to first, second, or third degree assault, he or she assaults another. RCW 9A.36.041(1).
¶ 39 At trial, McKague's defense counsel proposed an instruction on third degree assault as a lesser degree offense. The State objected, claiming that the facts did not support an inference that McKague negligently assaulted Chang. Initially agreeing, the trial court at first refused to instruct the jury on third degree assault. McKague's defense counsel asserted that, in light of the trial court's denial of his request for an instruction on third degree assault, he would request a jury instruction on fourth degree assault.
¶ 40 The following day, the trial court reconsidered its earlier denial and agreed to instruct the jury on third degree assault. As a result, McKague's defense counsel withdrew his request for a jury instruction on fourth degree assault. Ultimately, the trial court instructed the jury on third degree assault as an inferior degree offense of second degree assault.
¶ 41 Defense counsel's strategy was clear in closing argument: He conceded that "[w]e saw the bodily harm occur to Mr. Chang," but he contested the severity of the harm. Ill VRP at 268. Given that, in light of medical records, photographs, and testimony from witnesses and Chang himself, it was not possible to show that no bodily harm occurred, defense counsel reasonably concluded that the best strategy was to argue that third degree assault best fit the evidence. Barnes, 153 Wash.2d at 382, 103 P.3d 1219 (jury instructions are proper when they reflect a party's theory of the case). Similarly here, defense counsel admitted that "[McKague] committed the assault," III VRP at 278, but he argued that the evidence supported an inference that McKague inflicted bodily harm on Chang with only a mental state of criminal negligence (third degree assault), rather than recklessness (second degree assault).
*569 ¶ 42 Defense counsel also expressed his concern that, if instructed on second degree assault (requiring substantial bodily harm) and fourth degree assault (requiring no showing of bodily harm), a jury would summarily reject fourth degree assault. Counsel's strategy was legitimate and allowed him to argue the lesser third degree assault offense, which best reflected his theory of the case. McKague thus fails to meet the performance prong of the Strickland test. Accordingly, we do not reach the prejudice prong.

IV. PERSISTENT OFFENDER SENTENCE

A. Due Process
¶ 43 McKague next argues that the trial court violated his constitutional rights when it sentenced him as a "persistent offender" under RCW 9.94A.570 because the judge, not a jury, determined the existence of his prior convictions through a preponderance of the evidence. Br. of Appellant at 15. This argument also fails.
¶ 44 Taken together, the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution "entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (internal citation and quotation omitted). Although the right to a jury trial and the prosecution's burden of proof beyond a reasonable doubt are "constitutional protections of surpassing importance," Apprendi, 530 U.S. at 476, 120 S.Ct. 2348, the Supreme Court has decided that these protections do not apply to determining the existence of prior convictions. See Almendarez-Torres v. United States, 523 U.S. 224, 239, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); see also Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") (emphasis added); U.S. v. O'Brien, ___ U.S. ___, 130 S.Ct. 2169, 2174, 176 L.Ed.2d 979 (2010) (recognizing exception carved out by Almendarez-Torres).[12]
¶ 45 Our Supreme Court continues to follow this federal constitutional rule:
This court has repeatedly . . . held that Apprendi and its progeny do not require the State to submit a defendant's prior convictions to a jury and prove them beyond a reasonable doubt.
State v. Thiefault, 160 Wash.2d 409, 418, 158 P.3d 580 (2007) (citation omitted); see also State v. Roswell, 165 Wash.2d 186, 193 n. 5, 196 P.3d 705 (2008) (recognizing the "prior conviction exception" of Almendarez-Torres). Until such time as our Supreme Court overrules itself, we are bound by its holding on the issue before us here. State v. Burkins, 94 Wash.App. 677, 701, 973 P.2d 15 (1999) review denied, 138 Wash.2d 1014, 989 P.2d 1142 (1999) (citing State v. Hairston, 133 Wash.2d 534, 539, 946 P.2d 397 (1997)).
¶ 46 Although McKague acknowledges Almendarez-Torres, he asserts that its "`narrow exception'" "has been marginalized out of existence." Br. of Appellant at 22. Judge Quinn-Brintnall's concurrence/dissent similarly advocates that we not follow several recent cases from our Supreme Court that rely on Almendarez-Torres, such as State v. Thorne[13]; in support, the dissent asserts that the United States Supreme Court's recent decisions have implicitly held that the Almendarez-Torres analysis does not apply to cases such as this. See Concurrence/dissent (Quinn-Brintnall, J.) at 42-44. In essence, McKague and Quinn-Brintnall's concurrence/dissent urge us to disregard the United States Supreme Court's interpretation of the Sixth Amendment right to a jury trial in Almendarez-Torres, Apprendi, and their progeny and its refusal to date to extend the right to a jury trial to proof of prior convictions *570 in sentencing hearings conducted under recidivist statutes like the "Persistent Offender Accountability Act" (POAA), chapter 9.94A RCW. This we cannot and will not do.
¶ 47 The Supreme Court has cautioned expressly against the practice advanced by McKague and Judge Quinn-Brintnall's concurrence/dissent:
We [the United States Supreme Court] do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reason rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."
Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (emphasis added) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Adhering to this well-settled principle, the Ninth Circuit has confirmed that the Supreme Court has chosen not to overrule Almendarez-Torres "and [instead has] unmistakably carved out an exception for `prior convictions.'" United States v. Pacheco-Zepeda, 234 F.3d 411, 414 (9th Cir.2000) (quoting Apprendi, 530 U.S. at 488-92, 120 S.Ct. 2348), cert. denied, 532 U.S. 966, 121 S.Ct. 1503, 149 L.Ed.2d 388 (2001).[14]
¶ 48 Similarly, in 2003 our Supreme Court definitively held that neither the United States Constitution nor the Washington Constitution requires a jury, rather than a judge, to find the existence of prior convictions beyond a reasonable doubt. State v. Smith, 150 Wash.2d 135, 143, 156, 75 P.3d 934 (2003), cert. denied, 541 U.S. 909, 124 S.Ct. 1616, 158 L.Ed.2d 256 (2004). Consistent with its holding in Smith, just two years ago, our Supreme Court declined to review our decision in State v. Rudolph,[15] in which we also followed Almendarez-Torres in holding:
(1) existing caselaw does not give Rudolph the right to have a jury decide whether he is the same defendant who committed the crimes resulting in his prior convictions used as strike offenses to establish his persistent offender status under the POAA and, thus, subject him to life imprisonment without parole for his new crime; (2) identity is a fact so "intimately related to [the] prior conviction," under Jones, as to be virtually inseparable from the finding of the existence of a prior conviction; (3) the Almendarez-Torres fact-of-the-prior-conviction exception to the Apprendi/Blakely jury-trial requirement necessarily includes identity; and (4) thus, Apprendi and Blakely do not require a jury to decide the identity component of the fact of a prior conviction. Therefore, the sentencing court may, as it did here, find by a preponderance of the evidence that the perpetrator of the present crime is the same person as the perpetrator of a prior crime used as a strike offense for POAA sentencing purposes.
Rudolph, 141 Wash.App. 59, 71-72, 168 P.3d 430 (2007), review denied, 163 Wash.2d 1045, 190 P.3d 54 (2008).
¶ 49 Acknowledging that we cannot necessarily read anything definitive into either Supreme Court's denial of review in Smith and Rudolph, we note that (1) both high courts declined a clear opportunity to "correct" these Almendarez-Torres-based holdings if they deemed them incorrect; and (2) these review declinations underscore the importance *571 of the United States Supreme Court's clear admonition to the lower courts not to speculate about evolutions in case law, to adhere to controlling law, and to leave to the Supreme Court "the prerogative of overruling its own decisions." Agostini, 521 U.S. at 207, 117 S.Ct. 1997.
¶ 50 Accordingly, we hold that the trial court did not violate McKague's constitutional rights when the trial judge found the existence of McKague's prior convictions by a preponderance of the evidence for purposes of the POAA.

B. Equal Protection
¶ 51 McKague next argues that the trial judge's finding the existence of his prior convictions violated his equal protection rights under the Fourteenth Amendment to the United States Constitution and article I, section 12 of the Washington Constitution. He contends that it is "wholly arbitrary" to distinguish between: (1) requiring a jury to find, beyond a reasonable doubt, the existence of a prior conviction when the prior conviction is an element of an offense; and (2) allowing a judge to find, by a preponderance of evidence, the existence of prior convictions when a defendant is sentenced as a "persistent offender" under RCW 9.94A.570. Br. of Appellant at 30-31. We disagree.

1. Standard of review
¶ 52 Under the Fourteenth Amendment and article I, section 12 of the Washington Constitution, persons similarly situated with respect to the legitimate purpose of the law must receive like treatment. State v. Manussier, 129 Wash.2d 652, 672, 921 P.2d 473 (1996) (citing State v. Schaaf, 109 Wash.2d 1, 17, 743 P.2d 240 (1987)), cert. denied, 520 U.S. 1201, 117 S.Ct. 1563, 137 L.Ed.2d 709 (1997). A statutory classification that implicates physical liberty is not subject to the intermediate level of scrutiny under the equal protection clause unless the classification also affects a semi-suspect class, which is not the case here. Thorne, 129 Wash.2d at 771, 921 P.2d 514 (citing Westerman v. Cary, 125 Wash.2d 277, 294-95, 892 P.2d 1067 (1994)). Rather, persons such as McKague, who are "persistent offenders" under RCW 9.94A.570, are neither a suspect nor a semi-suspect class. Manussier, 129 Wash.2d at 673, 921 P.2d 473 (citing State v. Phelan, 100 Wash.2d 508, 514, 671 P.2d 1212 (1983), overruled on other grounds, In re Matter of Mota, 114 Wash.2d 465, 788 P.2d 538 (1990)). Thus, McKague's challenge to his life sentence imposed under the POAA is subject to rational basis review.
¶ 53 A statute survives rational basis review if the statute is rationally related to achieve a legitimate state interest and the classification does not rest on grounds that are wholly irrelevant to achieving the state interest. Schoonover v. State, 116 Wash.App. 171, 182, 64 P.3d 677 (2003) (citing DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 144, 960 P.2d 919 (1998)). The burden is on the party challenging the classification to show that it is "purely arbitrary." State v. Coria, 120 Wash.2d 156, 172, 839 P.2d 890 (1992) (quoting Omega Nat'l Ins. Co. v. Marquardt, 115 Wash.2d 416, 431, 799 P.2d 235 (1990)).

2. Reasonable grounds for distinguishing "classes"
¶ 54 McKague's challenge falls under the second prong of the rational basis test. He argues that there is no reasonable ground to distinguish between: (1) persons charged with an offense for which a prior conviction is an element of the offense and persons not charged with such offenses, and to whom the United States Constitution guarantees that a jury will find the prior conviction beyond a reasonable doubt;[16] and (2) persons whose prior convictions are found to exist when they are sentenced as "persistent offenders" under RCW 9.94A.570 and who are entitled only to have a judge find the existence of their prior convictions by a preponderance of evidence.[17] McKague argues that the State should afford both classifications of persons identical procedural safeguards when the trial court determines the person's prior convictions *572 because, for both classifications, the trial court determines prior convictions for the same purposeto "punish[] the recidivist criminal more harshly." Br. of Appellant at 29. This argument fails.
¶ 55 Our Supreme Court already has held that the State has a rational basis for distinguishing between "persistent offenders" and "non-persistent offenders" under the POAA. See Manussier, 129 Wash.2d at 674, 921 P.2d 473; see also Thorne, 129 Wash.2d at 771-72, 921 P.2d 514. It is also well-established that the weaker procedural safeguards given to "persistent offenders" during the fact-finding process of determining prior convictions do not violate any constitutional rights under Almendarez-Torres, Apprendi, or their progeny. See Part IV (A.) of this Analysis, supra. Although McKague may disagree with our state legislature's distinction between two classes of defendants and its decision to afford weaker procedural safeguards to one class, there is nothing unconstitutional about this practice under the current law. Thus, McKague's equal protection challenge fails.
¶ 56 Both the United States Supreme Court and our Washington Supreme Court have expressly held that recidivist statutes such as the POAA are not constitutionally infirm, on due process, equal protection, or other grounds. Accordingly, McKague's argument that the POAA violates the Equal Protection Clause of the Fourteenth Amendment or article I, section 12 of the Washington Constitution fails.[18]
¶ 57 I affirm McKague's convictions and POAA sentence.
ARMSTRONG, P.J. (dissenting in part) (concurring in part).
¶ 58 I disagree with the lead opinion that the evidence is sufficient to prove that McKague committed second degree assault and respectfully dissent.
¶ 59 The issue before us is whether Chang's injuries constitute substantial bodily harm. As the term "substantial" is not statutorily defined, the lead opinion correctly turned to dictionary definitions to identify its common understanding. Lead opinion at 7 n. 7; Am. Cont'l Ins. Co. v. Steen, 151 Wash.2d 512, 518, 91 P.3d 864 (2004). The lead opinion's misstep, however, is its selective choice of definition that renders the term redundant.
¶ 60 Our objective in construing a statute is to give effect to the legislature's intent. Udall v. T.D. Escrow Serv., Inc., 159 Wash.2d 903, 909, 154 P.3d 882 (2007). Statutes must be interpreted so that all the language used is given effect, with no portion rendered meaningless or superfluous. City of Seattle v. State, 136 Wash.2d 693, 701, 965 P.2d 619 (1998). Where we give a term its plain and ordinary meaning by reference to a dictionary, we must avoid literal readings of a statute which would result in unlikely, absurd, or strained consequences. Tingey v. Haisch, 159 Wash.2d 652, 663-64, 152 P.3d 1020 (2007).
¶ 61 A finding of substantial bodily harm requires that the State show an injury that *573 involves a temporary but substantial disfigurement or one that causes temporary but substantial loss or impairment of function of any bodily part or organ. RCW 9A.04.110(4)(b) (emphasis added). The lead opinion defines "substantial" as "something having substance or actual existence," "something having good substance or actual value," "something of moment," and "an important or material matter, thing, or part." Lead opinion at 7 n. 7 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 2280 (2002)). Accordingly, when the lead opinion applies this standard to the facts, it analyzes Chang's injuries to see if they actually existed. But there is no difference in proving that a victim suffered bodily harm and proving that the victim's injuries are actual. Even taking the most generous definition afforded by the lead opinionthat the injuries be "important"gives little meaning to an objective legal standard. To define "substantial" as such gives no effect to the word in the context of the statute, an interpretation the legislature could not have intended.
¶ 62 In fact, the word "substantial" is an important qualification in the statute that distinguishes second degree assault, a most serious offense under the Persistent Offender Accountability Act (POAA), from lesser degree assaults that require a showing of only bodily harm, such as third degree assault. See e.g., RCW 9A.36.031(1)(d), (f). One definition omitted by the lead opinion defines "substantial" as "considerable in amount, value, or worth." WEBSTER'S THIRD NEW INT'L DICTIONARY 2280 (2002). I believe that where the term "substantial" functions as an adjective that describes the extent of bodily harm, this definition properly reflects the legislature's intent to differentiate degrees of injury.
¶ 63 Turning to the evidence presented by the State, I do not believe that it supports a finding of substantial bodily harm. First, the facial computed tomography (CT) scan, which established symptoms that may indicate a fracture, is insufficient to show substantial bodily harm. RCW 9A.04.110(4)(b), by its plain terms, requires the existence of a fracture, not the mere possibility of one.
¶ 64 Second, although bruising can constitute substantial bodily harm when it rises to the level of substantial disfigurement, State v. Hovig, 149 Wash.App. 1, 13, 202 P.3d 318 (2009), the bruising in this case does not meet this standard. Relying on Hovig, the lead opinion claims that "visible bruising itself rises to the level of temporary substantial disfigurement." Lead opinion at 8. This is a departure from the proposition in Hovig that "serious bruising can rise to the level of `substantial bodily injury . . .'". Hovig, 149 Wash.App. at 13, 202 P.3d 318 (emphasis added). Admittedly, other courts have held that "[t]he presence of . . . bruise marks indicates temporary but substantial disfigurement." State v. Ashcraft, 71 Wash.App. 444, 455, 859 P.2d 60 (1993). But these cases are factually distinguishable based on the severity of the bruising. As described below, Chang's injuries are dramatically less serious than those described in cases where bruising constituted substantial bodily harm. Untethered from facts, the proposition that apparent bruising always amounts to substantial bodily harm runs the risk of rendering the term "substantial" redundant.
¶ 65 In Hovig, 149 Wash.App. at 13, 202 P.3d 318, the court found sufficient evidence of substantial bodily harm based on photos of the victim's bruising and medical testimony that the bruise would have lasted 7 to 14 days and caused pain. The photos in that case showed individual red and violet teeth marks from the base of the victim's jaw to the top of his right cheek bone, yellow-brown bruising on the entire right cheek, bright red bruising on the victim's left cheek, and scratch marks on the victim's back and stomach. Hovig, 149 Wash.App. at 5-6, 202 P.3d 318. In Ashcraft, 71 Wash.App. at 455, 859 P.2d 60, the substantial disfigurement was proven by medical testimony that the bruise marks on the victim were consistent with being hit by a shoe. In State v. Atkinson, 113 Wash.App. 661, 666-67, 54 P.3d 702 (2002), the court held that the defendant caused temporary but substantial disfigurement where the victim was scraped and bruised, her eyes were black and blue, and the white of her eye was bloody.
*574 ¶ 66 Here, Chang's bruising, while disfiguring, does not rise to the level of substantial disfigurement needed to support a conviction of second degree assault. The photographs of Chang do not show bruising that makes obvious the cause of his injury. See Hovig, 149 Wash.App. at 5, 202 P.3d 318 (bruise showing clear bite mark); Ashcraft, 71 Wash. App. at 455, 859 P.2d 60 (bruise indicating being hit with shoe). Nor was there any medical testimony or report describing the nature or extent of bruising. Detective Costello testified that the clearest photo of the bruising was from three days after the incident, which he described as showing Chang's eye starting to turn yellow. This description falls significantly short of the injuries described in Ashcraft, Hovig, and Atkinson.
¶ 67 Moreover, Chang's swollen eye, puffy face, head laceration, and abrasion on his cheek, while disfiguring, are not automatically substantial. Detective Costello described the swelling around his eyes as causing it to be "a little bit shut or closer shut than normal." I Verbatim Report of Proceedings (VRP) at 49; II VRP at 175. This description also falls short of proving an injury that is "considerable in amount." Likewise, Samuelson's testimony that Chang "obviously" had injuries and "looked like he was affected, affected by [the] blows," I VRP at 36-37, can only satisfy the lax standard of showing actual injuries. Besides a concussion without loss of consciousness and neck and shoulder pain, his medical evaluation states only the existence of a scalp contusion. In the cases relied on by the lead opinion, medical testimony helped in assessing the extent of harm done to the victim. See Hovig, 149 Wash. App. at 13, 202 P.3d 318 (both persuasive photographic evidence and medical testimony were used to show substantial bodily harm); Ashcraft, 71 Wash.App. at 455, 859 P.2d 60 (doctors at Children's Hospital testified to nature of injury). Here, there is no such medical evidence regarding any disfigurement. Without persuasive photographs and medical evidence, the mere fact that Chang sustained bruises and injuries is insufficient to support his conviction.
¶ 68 Finally, despite the lead opinion's effort to qualify Chang's concussion and shoulder and neck pain as substantial bodily harm, the evidence does not meet this standard. The State's best evidence to this pointthat Chang seemed "a little bit off," that he was dizzy, and that he was unable to stand for a whileshows that he undoubtedly suffered temporary loss or impairment. Lead opinion at 2, 10. But again, we cannot assume the loss was substantial. Although the medical report shows that Chang suffered a concussion, he did not lose consciousness. Thus, the injury did not cause any loss that was established on the record. The lead opinion cites the patient's discharge instructions to show that concussions can result in several different types of losses and impairments.[19] This discharge information, however, can hardly count as evidence of Chang's experience. The instructions speak in general terms of hypothetical symptoms ("a concussion may cause. . ."), none of which were specifically connected to Chang's medical evaluation. The discharge information is cautionary for patients to monitor symptoms and protect against complications. As such, it is too tenuous for a jury to infer that Chang suffered any of these effects. The evidence of slight disorientation does not meet the standard sufficient to sustain a second degree assault.
¶ 69 The lead opinion also reasons that severe pain supports a reasonable inference of substantial bodily injury. But "pain" is no longer a part of the definition of "substantial bodily injury" under RCW 9A.04.110(4)(b). Even if the change in statute does not preclude a finding that the pain caused some form of impairment, there is no evidence in the record to show that Chang's neck and shoulder pain resulted in a substantial loss of the use of his arm and shoulder function. Although he testified to lingering pain, he did not attribute any loss of function to the pain. *575 To do so is speculation, a conclusion foreclosed by the legislature when it deleted pain as an indicator of substantial bodily harm. Accordingly, I would reverse the conviction for second degree assault.
¶ 70 In affirming the conviction, the lead opinion is split on the sentencing issues under the POAA. Thus, as a matter of law, I concur with Judge Hunt that the federal constitution does not require that a jury find the existence of prior convictions beyond a reasonable doubt under the POAA.
QUINN-BRINTNALL, J. (concurring in part and dissenting in part).
¶ 72 On October 17, 2008, Jay McKague, a homeless man, stole a can of smoked oysters from Kee Ho Chang's grocery store. When Chang attempted to apprehend McKague in the store's parking lot, McKague punched Chang, who fell to the ground. As Chang lay on the ground, McKague hit him several times before jumping into a car and fleeing the scene. Various witnesses testified that McKague hit Chang a total of three to ten times; Chang testified that McKague hit him six times.
¶ 73 Chang testified that, after the incident, when he tried to stand up, he got "very dizzy" so he sat on the ground for a while. 1 Report of Proceedings at 64. Photographs taken the day of the incident and three days later showed bruising around Chang's left eye, redness and swelling of the left cheek, and a contusion on Chang's head. The emergency room documented Chang's injuries including a concussion, a scalp contusion, and neck and shoulder pain. A computerized axial tomography scan (CT scan) showed a possible occult fracture of Chang's facial bones.[20]
¶ 74 The State charged McKague with first degree robbery, in violation of RCW 9A.56.200(1), and second degree assault, in violation of RCW 9A.36.021(1)(a). The jury found McKague guilty of third degree theft, in violation of former RCW 9A.56.050 (1998), as a lesser included offense of first degree robbery, and guilty of second degree assault as charged. Because McKague had prior felony convictions for second degree assault, first degree kidnapping, and first degree robbery, he was sentenced to life without the possibility of parole under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570.
¶ 75 I agree with the lead opinion that the trial court properly refused McKague's bench trial request, that the jury instructions and the evidence properly support the jury verdict finding McKague guilty of second degree assault, and concur that McKague's convictions should be affirmed.
¶ 76 In my opinion, Judge Armstrong's stated concern about the improper use of expert testimony to support the lead opinion's second degree assault sufficiency analysis is unfounded. Concurrence/dissent (Armstrong, J.) at 31 n. 19. Although the citation to expert treatises on the effects of concussion on the brain support our analysis, they are unnecessary to the sufficiency determination. Any modern parent whose child plays football, skateboards, or rides a bicycle has read the warning label regarding the importance of avoiding a brain injury (concussion). Moreover, many newspaper sports stories report on concussions that players in various sports sustain and the effect of these injuries on players' skills and careers. In fact, the recent national awareness of the effects of concussions in sporting events started, in part, because of traumatic incidents that occurred in our state. The effects of concussions during school sporting events became of such public concern in our state that, in 2009, our legislature passed a law prohibiting youth athletes suspected of sustaining a concussion from continuing to practice or play in a game without written medical clearance from a health care provider who has specialized concussion training.[21] Laws of 2009, ch. *576 475, § 2. Thus, in my opinion what constitutes a concussion and the effects of a concussion are not subjects that required expert testimony. Here, the emergency room report established the fact of McKague's concussion; it and the other evidence in the record discussed by the lead opinion, is sufficient as a matter of law for any rational jury to find substantial injury beyond a reasonable doubt.
¶ 77 Because the legislature determined that the maximum sentence which may be imposed on a jury verdict finding McKague guilty of second degree assault is 10 years,[22] however, and because the cases relied on in analyzing McKague's challenges to his POAA sentence predate contrary controlling authority, I respectfully dissent from that portion of the opinion affirming McKague's sentence of life without the possibility of parole.
¶ 78 In holding that McKague was not entitled to have a jury find him a persistent offender beyond a reasonable doubt before being sentenced to life without possibility of parole under the POAA, the lead opinion fails to comply with the constitutional principles elucidated in Apprendi[23] and Blakely.[24] Here, I reiterate and expand the analysis in my dissent in State v. Rudolph, 141 Wash. App. 59, 72, 168 P.3d 430 (2007), review denied, 163 Wash.2d 1045, 190 P.3d 54 (2008), that under Blakely, a trial court sitting without a jury may not constitutionally sentence a defendant to life without the possibility of parole on a class B felony that otherwise carries a maximum term of 10 years.
¶ 79 Recidivist statutes, such as the POAA, have been part of American sentencing for over 100 years. And dating back to at least 1912, courts and commentators have recognized that these habitual criminal prosecutions require proof of two matters: (1) the existence of prior convictions and (2) the identity of the defendant as the prior convict. See, e.g., Graham v. W. Virginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912); United States v. Jackson, 368 F.3d 59, 67-68 n. 9 (2d Cir.2004); KYRON HUIGENS, SOLVING THE APPRENDI PUZZLE, 90 Geo. L.J. 387, 408 (2002). Historically, the State was required to prove to a jury beyond a reasonable doubt that the defendant to be sentenced under a recidivist statute was the person who was previously convicted of statutorily qualifying offenses. See State v. Furth, 5 Wash.2d 1, 10, 104 P.2d 925 (1940).
¶ 80 Under the current POAA statutes, the legislature requires that trial courts sentence "persistent offenders" to life without possibility of parole. RCW 9.94A.570. A "persistent offender" is an offender with three "strikes." Former RCW 9.94A.030(37)(a)(i), (ii) (2008); State v. Crawford, 159 Wash.2d 86, 89-90, 147 P.3d 1288 (2006). "Strikes" are convictions for felonies that are "most serious offenses" as defined in former RCW 9.94A.030(32) (2008). Prior foreign convictions, including out-of-state convictions, are strikes if they are comparable to a Washington strike offense. Former RCW 9.94A.030(37)(a)(ii); In re Pers. Restraint of Lavery, 154 Wash.2d 249, 254, 111 P.3d 837 (2005). A trial court must sentence a defendant to life without possibility of parole upon a conviction for a third strike offense. RCW 9.94A.570.
¶ 81 When the Washington legislature enacted the POAA, it withdrew the right to a jury trial. In a POAA proceeding, the legislature authorized judges to find, under a *577 preponderance of evidence standard, whether the defendant was a persistent offender (habitual criminal). Our Supreme Court held that this procedure was constitutionally permissible and ruled that prior convictions resulting in a life without parole sentence need not be pleaded in the information, submitted to a jury, or proved beyond a reasonable doubt. State v. Wheeler, 145 Wash.2d 116, 117, 34 P.3d 799 (2001), cert. denied, 535 U.S. 996, 122 S.Ct. 1559, 152 L.Ed.2d 482 (2002).
¶ 82 The Washington Supreme Court addressed the question of whether a defendant's constitutional right to a jury trial is violated in a POAA proceeding in State v. Thorne, 129 Wash.2d 736, 921 P.2d 514 (1996). Relying on pre-Apprendi case law, the court held that judicial sentencing under the POAA did not violate the right to a jury trial:
As a practical matter, since the only two questions of fact relevant to sentencing under the persistent offender section of the [Sentencing Reform Act of V 1981(SRA), ch. 9.94A RCW] are whether certain kinds of prior convictions exist and whether the defendant was the subject of those convictions, we fail to see how the presence of a jury would be necessary. Prior convictions are proved by certified copies of the judgment and sentence, [State v. Murdock, 91 Wash.2d 336, 340, 588 P.2d 1143 (1979)], and identity (if contested) can be proved by fingerprints. The sentencing judge can make those determinations. While technically questions of fact, they are not the kinds of facts for which a jury trial would add to the safeguards available to a defendant. In fact, judges decide such questions of fact routinely at SRA sentencing proceedings. A certified copy of a judgment and sentence is highly reliable evidence. State v. Gentry, 125 Wash.2d 570, 637, 888 P.2d 1105, cert. denied, 516 U.S. 843 [116 S.Ct. 131, 133 L.Ed.2d 79] (1995); see [United States v. McGatha, 891 F.2d 1520, 1526 (11th Cir.), cert. denied, 495 U.S. 938, 110 S.Ct. 2188, 109 L.Ed.2d 516 (1990)] (prior convictions are highly verifiable matters of public record). We find no constitutional bar to the provision of the SRA which allows a trial court to conduct the sentencing proceedings. RCW 9.94A.110.
Thorne, 129 Wash.2d at 783, 921 P.2d 514, cited in Almendarez-Torres v. United States, 523 U.S. 224, 246-47, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), quoted in State v. Smith, 150 Wash.2d 135, 148, 75 P.3d 934 (2003), cert. denied, 541 U.S. 909, 124 S.Ct. 1616, 158 L.Ed.2d 256 (2004). In summary, the Thorne court held that it is not necessary to impanel a jury for POAA sentencing because judges traditionally find these facts and the evidence is reliable.
¶ 83 After Apprendi, our Supreme Court continued to rely on Thorne's outdated analysis and held in Smith and Wheeler that the procedure allowing a judge to find the fact of a prior conviction under the POAA does not violate the right to jury trial.[25]Smith, 150 Wash.2d at 155, 75 P.3d 934; Wheeler, 145 Wash.2d at 121, 124, 34 P.3d 799. In Smith, the court quoted Thorne approvingly and adopted a preponderance of evidence standard for proof of a prior conviction. The Smith court reasoned that no additional safeguards are required because a certified copy of a judgment and sentence is highly reliable evidence. 150 Wash.2d at 143, 75 P.3d 934, following Wheeler, 145 Wash.2d 116, 34 P.3d 799.
¶ 84 But after our Supreme Court issued Smith and Wheeler, the United States Supreme Court clarified the Sixth Amendment's jury trial right in Blakely v. Washington, 542 U.S. 296, 303-04, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and Cunningham v. California, 549 U.S. 270, 281-88, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007). These recent United States Supreme Court opinions invalidate the basis for the analysis in Thorne, Smith, Wheeler, and other Washington cases that rely on that precedent.
¶ 85 A criminal defendant's jury trial right is the foundation and heart of our criminal justice system. In Blakely, Justice Scalia, writing for the majority, concluded bluntly,

*578 The Framers would not have thought it too much to demand that, before depriving a man of . . . his liberty, the State should suffer the modest inconvenience of submitting its accusation to "the unanimous suffrage of twelve of his equals and neighbours," [4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 343 (1769)], rather than [the judge,] a lone employee of the State.
542 U.S. at 313-14, 124 S.Ct. 2531.
¶ 86 Except on a jury's verdict finding a defendant guilty of aggravated first degree murder, no Washington trial court may impose a sentence of life without possibility of parole based on the jury's verdict alone. Under controlling Sixth Amendment analysis, a legislature's characterization of necessary factual findings as "sentencing factors" rather than "elements" is irrelevant. The Blakely Court outright rejected the interpretation of Apprendi that a "jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factorsno matter how much they may increase the punishmentmay be found by the judge." 542 U.S. at 306, 124 S.Ct. 2531. The Court stated that this approach would lead to "absurd result[s]" and would undermine an essential jury function:
The jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State actually seeks to punish.
Blakely, 542 U.S. at 306-07, 124 S.Ct. 2531.[26]
¶ 87 And most recently, in Cunningham, the United States Supreme Court again flatly rejected attempts to base the jury trial right on a sentencing code's structure, the historical discretion of courts in determining facts that underlie higher sentences, or the reliability of evidence to support increased penalties. 549 U.S. at 283-86, 290, 127 S.Ct. 856. These discredited rationales are the sole bases on which Thorne relies. After Cunningham, it is clear that the defendant's right to a jury trial rests on a "bright-line rule" that is not subject to policy concerns such as what the legislature intended or whether the evidence that the fact finder is to evaluate is particularly reliable. 549 U.S. at 283-86, 290, 127 S.Ct. 856; see also Washington v. Recuenco, 548 U.S. 212, 220, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (holding that there is no distinction in the right to jury trial between "sentencing factors" and "elements").
¶ 88 Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and its progeny overruled the precedent on which Thorne rests. The Thorne court summarized the then current law, saying, "[T]he United States Supreme Court has repeatedly held that a defendant does not enjoy a constitutional right to a jury determination as to the appropriate sentence to be imposed even where the sentence turns on specific findings of fact." 129 Wash.2d at 782, 921 P.2d 514. Apprendi overruled this interpretation of the Sixth Amendment and eroded Thorne. Likewise, because Smith and Wheeler are premised on Thorne and a pre-Blakely and pre-Cunningham understanding of the right to jury trial, they are no longer good authority on this issue.
¶ 89 After Blakely, our Supreme Court reiterated, but qualified, the rulings of Smith and Wheeler. See Lavery, 154 Wash.2d at 256-57, 111 P.3d 837 (discussing Smith, 150 Wash.2d 135, 75 P.3d 934, and Wheeler, 145 Wash.2d 116, 34 P.3d 799). In Lavery,[27] the court first held that "[l]ife without possibility of parole is a penalty beyond the statutory maximum for the crime of second degree robbery," and held that Apprendi applied.[28] *579 154 Wash.2d at 256, 111 P.3d 837. The court then reiterated its rulings in Smith and Wheeler. Lavery, 154 Wash.2d at 256-57, 111 P.3d 837. And it held that a jury must determine facts relating to comparability analysis when foreign crimes are not facially identical to Washington offenses. Lavery, 154 Wash.2d at 258, 111 P.3d 837. Thus, in Lavery, the court implicitly ruled that the right to jury trial applies to facts at POAA sentencing, while accepting that the "prior conviction" exception allows a judge to determine legal comparability in many situations.[29] In doing so, the court rejected the notion that the POAA is exempt from the Sixth Amendment right to jury trial because it is a recidivist statute.
¶ 90 Blakely and Apprendi are grounded in the United States Constitution's Sixth Amendment. These cases establish that a defendant's minimum jury trial right includes the right to have the fact of the existence of a prior conviction proved beyond a reasonable doubt to a jury[30] before a POAA sentence of life without the possibility of parole may be imposed on someone found guilty by a jury of a class B or lower felony.[31]
¶ 91 The lead opinion characterizes Blakely and Cunningham as "[t]wo additional cases, on which McKague and Judge Quinn-Brintnall's concurrence/dissent rely, [that] also affirm the rule of Almendarez-Torres." Lead opinion at 19 n. 12. Blakely and Cunningham do state that the fact of a prior conviction need not be proved to a jury beyond a reasonable doubt. But, unlike here, Blakely and Cunningham address circumstances in which the sentence considered lies within the legislature's maximum penalty for the offense of conviction. Blakely, 542 U.S. at 299-300, 124 S.Ct. 2531 (concerning an exceptional sentence of 90 months, which represented a 37-month increase beyond the standard sentencing range, but that did not exceed the 10-year statutory maximum for a class B felony); Cunningham, 549 U.S. at 275-76, 127 S.Ct. 856 (imposing the maximum permitted statutory sentence because of aggravating factors). In other words, if, as a recidivist, McKague faced a maximum POAA sentence of 10 years (the statutory maximum for the crime the jury found he committed), the Almendarez-Torres prior conviction exception would be consistent with the application of the constitutional principle announced in Apprendi and Blakely and McKague would have received his full Sixth Amendment jury trial rights. But where the trial court seeks to impose a sentence that exceeds the one supported by the jury verdict, here the period in excess of 10 years and for the rest of McKague's life, the defendant's right to have his sentence supported by a jury's verdict remains unfulfilled.
¶ 92 The lead opinion also cites a post-Blakely POAA case, State v. Thiefault, 160 Wash.2d 409, 158 P.3d 580 (2007), and asserts that "[u]ntil such time as our Supreme Court overrules itself, we are bound by its holding on the issue before us here." Lead opinion at 20. The Thiefault court stated that it had "repeatedly . . . held that Apprendi and its progeny do not require the State to submit a defendant's prior convictions to a jury and prove them beyond a reasonable doubt." 160 *580 Wash.2d at 418, 158 P.3d 580. The Thiefault court's statement relies on Lavery, Smith, Wheeler, and Almendarez-Torres. Thiefault, 160 Wash.2d at 418, 158 P.3d 580. But Smith and Wheeler are no longer good law after Blakely. And Lavery did not cite Blakely or address the constitutional principles underpinning Blakely's application of Apprendi to sentences in excess of the standard range but within the range of the maximum possible penalty set by the legislature. Accordingly, although Thiefault states that a defendant in a POAA proceeding has no right to have his prior convictions proved to a jury beyond a reasonable doubt, there is no valid law supporting this statement, particularly in situations when the imposed sentence exceeds legislatively mandated statutory maximum penalties.
¶ 93 Moreover, controlling authority from the United States Supreme Court does not require lower courts to apply higher court holdings which violate the constitution. Unlike the situation addressed in Agostini v. Felton, 521 U.S. 203, 207, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), in which the apparently controlling precedent rested "`on reasons rejected in some other line of decisions'" (emphasis added) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)), here the most recent and controlling precedent of our nation's highest court, Blakely, directly precludes imposing a sentence not supported by the jury's verdict and in excess of the statutorily proscribed maximum penalty. Specifically, Justice Scalia's unambiguous conclusion that before depriving a criminal defendant of years of his or her liberty "beyond what the law allowed for the crime," that "the State should suffer the modest inconvenience of submitting its accusation to `the unanimous suffrage of twelve of his equals and neighbours,' 4 BLACKSTONE, supra, at 343, rather than [the judge,] a lone employee of the State." Blakely, 542 U.S. at 313-14, 124 S.Ct. 2531. Thus, the Blakely court clarified that Apprendi's and Almendarez-Torres's prior conviction exception does not apply in cases where the trial court wishes to impose a sentence in excess of the statutory maximum without a supporting jury verdict.[32]
¶ 94 In addition, in my opinion, by rejecting the State's first degree robbery charge, a class A felony with a possible life sentence under RCW 9A.20.021(1)(a), and finding McKague guilty of third degree theft (a gross misdemeanor) and second degree assault (a class B felony), the jury who sat in judgment of McKague clearly indicated its intention to show leniency to a hungry homeless man who stole a can of smoked oysters. By sentencing McKague to life without the possibility of parole on the jury's verdict rejecting the State's class A felony charge and finding him guilty of only a gross misdemeanor and a class B felony, the trial court in this case imposed a sentence in excess of that supported by the jury verdict and, therefore, beyond its constitutional authority. Accordingly, I would reverse the sentence but affirm the convictions.
NOTES
[1] U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 12.
[2] Various witnesses testified that McKague hit Chang three to ten times; Chang testified that McKague hit him six times.
[3] "The term occult fracture is used to describe an injury to bone that is clinically suspected, but cannot be identified on initial radiographs." Lee F. Rogers, Mihra S. Taljanovic & Carol A. Boles, Skeletal Trauma, in GRAINGER & ALLISON'S DIAGNOSTIC RADIOLOGY ch. 46 (5th ed.2008) available at http://ww.mdconsult.com/das/book/body/XXXXXXXXX-X/0/1611/50.html.
[4] McKague argued that the evidence established only that he may have acted with criminal negligence (third degree assault), rather than recklessness (second degree assault), and, therefore, he was entitled to a third degree assault jury instruction.
[5] Compare CP at 48 with 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 37.02, at 667-68 (3d ed. 2008) (WPIC) (first degree robbery); CP at 52 with 11A WPIC 70.11 at 59 (third degree theft); CP at 49 with 11 WPIC 35.13 at 471 (second degree assault); CP at 55 with 11 WPIC 35.24 at 503 (third degree assault).
[6] The two prior strikes were for a second degree assault conviction on May 16, 1990, and first degree kidnapping and first degree robbery convictions on December 20, 1995.
[7] RCW 9A.04.110(4)(b) does not provide a definition of "substantial"; accordingly, we turn to dictionary definitions to identify its common understanding. See, e.g., State v. Hacheney, 160 Wash.2d 503, 518, 158 P.3d 1152 (2007), cert. denied, 552 U.S. 1148, 128 S.Ct. 1079, 169 L.Ed.2d 820 (2008). The dictionary defines "substantial" as "something having substance or actual existence," "something having good substance or actual value," "something of moment," and "an important or material matter, thing, or part." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (2002).
[8] A general understanding of the term "concussion" as it relates to brain injuries is "a jarring injury of the brain resulting in disturbance of cerebral function and sometimes marked by permanent damage." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 472 (2002) (emphasis added). Chang's medical report suggests that concussions are accompanied by loss of consciousness. The Mayo Clinic states that concussions have a range of significance but all "temporarily interfere with the way your brain works" and "injure[] your brain," even if not resulting in "a loss of consciousness." MayoClinic.com, Concussion: Definition, Aug. 31, 2010, http://www.mayoclinic.com/health/concussion/DS00320. Other major complications of a concussion may include "[p]ostconcussion syndrome," a term briefly discussed in Chang's medical files, which "causes concussion symptoms to last for weeks or months." MayoClinic.com, Concussion:Complications, Aug. 31, 2010, http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=complications.

Furthermore, a history of a single concussion increases one's risk of future concussions and doubles the risk for developing epilepsy within five years of brain injury. MayoClinic.com, Concussion: Complications, Aug. 31, 2010, http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=complications;Mayoclin-ic.com, Concussion: Risk Factors, Aug. 31, 2010, http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=risk "factors. In other words, a person who has suffered a concussion has suffered permanent bodily harm making him more vulnerable to future brain injury.
[9] A jury instruction that creates a mandatory presumption improperly relieves the State of its burden to prove every element of the charged crime beyond a reasonable doubt, thus violating the defendant's due process rights. See State v. Thomas, 150 Wash.2d 821, 844, 83 P.3d 970 (2004).
[10] We further note that jury instruction on "recklessness" in McKague's trial was based on the Washington's Practice Series pattern instruction, which provides:

[When recklessness [as to a particular [result] [fact]] is required to establish an element of the crime, the element is also established if the person acts [intentionally] [or] [knowingly] [as to that [result] [fact]].]
11 WPIC 10.03 at 209; see also former RCW 9A.08.010(2) ("When recklessness suffices to establish an element, such element also is established if a person acts intentionally or knowingly.")
[11] RAP 10.10.
[12] Two additional cases, on which McKague and Judge Quinn-Brintnall's concurrence/dissent rely, also affirm the rule of Almendarez-Torres. See Blakely v. Washington, 542 U.S. 296, 301, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); see also Cunningham v. California, 549 U.S. 270, 282, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007).
[13] State v. Thorne, 129 Wash.2d 736, 781-84, 921 P.2d 514 (1996).
[14] Consistent with the concerns the Supreme Court voiced in Agostini, the Ninth Circuit noted that "Apprendi casts doubt on the continuing viability of Almendarez-Torres" and that "[i]f the views of the Supreme Court's individual Justices and the composition of the Court remain the same, Almendarez-Torres may eventually be overruled." Pacheco-Zepeda, 234 F.3d at 414. Nevertheless, the Ninth Circuit acknowledged that "such speculation" did not give it an excuse to ignore Almendarez-Torres and "[u]nless and until Almendarez-Torres is overruled by the Supreme Court, we must follow it." Pacheco-Zepeda, 234 F.3d at 414 (citing Agostini, 521 U.S. at 237, 117 S.Ct. 1997). With all due respect to our dissenting colleague here, we, too, must follow Almendarez-Torres so long as it remains the controlling authority.
[15] Rudolph was a split decision, again, with Judge Hunt writing for the majority, joined by Judge Van Deren, and with Judge Quinn-Brintnall dissenting.
[16] See Winship, 397 U.S. at 364, 90 S.Ct. 1068; Roswell, 165 Wash.2d at 192, 196 P.3d 705.
[17] See Apprendi, 530 U.S. at 490, 120 S.Ct. 2348; Thiefault, 160 Wash.2d at 418, 158 P.3d 580.
[18] McKague bases his equal protection challenge, in part, on Roswell, a POAA case that is inapposite. Roswell examines Apprendi's holding that a jury must find, beyond a reasonable doubt, both the elements of a crime and any aggravating sentencing factors that increase the penalty for a crime above the statutory maximum. Roswell, 165 Wash.2d at 193, 196 P.3d 705 (citing Apprendi, 530 U.S. at 490, 120 S.Ct. 2348). Roswell held that Apprendi permits a defendant who has pled guilty, or has been tried and convicted by a jury, to waive his right to jury fact-finding for aggravating sentencing factors and, instead, to request that a judge find the aggravating sentencing factors. Roswell, 165 Wash.2d at 193, 196 P.3d 705 (citing State v. Hughes, 154 Wash.2d 118, 133-34, 110 P.3d 192 (2005), overruled on other grounds, Washington v. Recuenco, 548 U.S. 212, 222 n. 4, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006)). The Roswell court noted that RCW 9.68A.090(2) includes as an element of the crime of felony communication with a minor for immoral purposes the 2546, 548 U.S. 212, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006). The Roswell court noted that RCW 9.68A.090(2) includes as an element of the crime of felony communication with a minor for immoral purposes the existence of a prior sexual felony conviction. In this situation the prior sexual felony conviction is not simply an aggravating sentencing factor. Therefore, if the defendant elects a trial by jury, the jury, not the judge, must find the existence of all elements of the crime beyond a reasonable doubt, including the prior sexual felony conviction element. Roswell, 165 Wash.2d at 194, 196 P.3d 705.
[19] The lead opinion offers extensive information from the Mayo Clinic explaining how a concussion, even without loss of consciousness, can interfere with how one's brain works and injure one's brain. This technical information regarding the effects of concussions, tantamount to expert medical testimony, should not be considered by this court as it was not presented to the jury.
[20] An occult fracture is one believed to exist but the exact location cannot be determined. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1560 (2002) (defining "occult" as "not manifest or detectable by clinical methods alone").
[21] In particular, our legislature chose to address student athlete safety concerns after an incident in 2006 when 13-year-old Zachery Lystedt, after whom the 2009 law is named, was a student at Tahoma Junior High and continued playing football after a concussion went unnoticed. LAWS OF 2009, ch. 475, § 2. Hours after the game ended, Lystedt slipped into a coma for three months, underwent extensive brain surgeries, and has undergone years of intensive therapy just to be able to swallow and speak again. Tom Wyrwich, Special Report: The Dangers of Adolescents Playing Football with Concussions, THE SEATTLE TIMES (Nov. 4, 2008), available athttp://seattletimes.nwsource.com/html/highschoolsports/2008347382_concussions04.html.
[22] Second degree assault is a class B felony. RCW 9A.36.021(2)(a). The statutory maximum sentence for class B felonies is 10 years. RCW 9A.20.021(1)(b). But under the Sentencing Reform Act of 1981(SRA), ch. 9.94A RCW, second degree assault is a level four seriousness offense. Former RCW 9.94A.515 (2007). When a defendant's offender score is 9 or more, and here McKague's offender score was 11, the presumptive sentencing range for a level four offense is 63 to 84 months. RCW 9.94A.510.
[23] Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[24] Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).
[25] The Washington Constitution is not more protective than is the federal constitution in the arena of POAA sentencing. Smith, 150 Wash.2d at 156, 75 P.3d 934.
[26] Our Supreme Court neither cited nor addressed this Blakely holding when it held that the State need not notify a defendant that he faces a POAA sentence and reasoned that (1) the POAA is a sentencing statute, not a statute defining the elements of the crime; (2) the legislature alone fixes sentencing procedures; (3) the legislature does not explicitly require pretrial notice of POAA sentences; and (4) therefore, notice is not required. Crawford, 159 Wash.2d at 93-96, 147 P.3d 1288. This rationale contradicts Blakely and Cunningham.
[27] The Lavery court did not discuss or cite Blakely.
[28] Lavery's second degree robbery conviction (without a jury finding of aggravating factors) subjected him to a maximum penalty of 84 months under the SRA. Lavery, 154 Wash.2d at 254, 111 P.3d 837.
[29] One month after our Supreme Court published Lavery, this court issued State v. Ball, 127 Wash.App. 956, 113 P.3d 520 (2005), review denied, 156 Wash.2d 1018, 132 P.3d 734 (2006). Ball focused on the necessity of separately proving Washington State convictions of which the trial court had authority to take judicial notice. It did not expressly address the Lavery court's analysis holding that under Apprendi, a sentence of life without possibility of parole exceeds the statutory maximum that may be imposed on a jury's guilty verdict. Lavery, 154 Wash.2d at 256, 111 P.3d 837; but cf. State v. Magers, 164 Wash.2d 174, 193, 189 P.3d 126 (2008) (holding that "the Court of Appeals has held that Blakely does not apply to sentencing under the POAA, Blakely being specifically directed at exceptional sentences. [Ball, 127 Wash.App. at 957, 959-60, 113 P.3d 520]. We agree with this conclusion and determine that Blakely has no application to the instant case.").
[30] This element does not require proving the elements of the prior strike offense anew; rather only proof beyond a reasonable doubt that the defendant alleged to be a persistent offender is the person previously convicted of that offense is required.
[31] Because McKague's due process rights were violated, I do not address his sentencing equal protection argument.
[32] The lead opinion cites United States v. O'Brien, ___ U.S. ___, 130 S.Ct. 2169, 176 L.Ed.2d 979 (2010), as "recognizing [the Apprendi] exception carved out by Almendarez-Torres." Lead opinion at 19. But O'Brien concerned whether a firearm was an element of a substantive offense charged under federal law. The O'Brien court did not address recidivism questions or analyze and apply the Apprendi prior conviction exception. Accordingly, O'Brien's mere recitation of the Apprendi exception does not supplant Cunningham's analysis and, therefore, Cunningham remains the controlling authority on this matter.